**Marilyn H. WILLIAMS,
Plaintiff–Appellant,**

v.

**GENERAL MOTORS CORPORATION,
Defendant–Appellee.**

No. 97–3351.

United States Court of Appeals,
Sixth Circuit.

Argued April 21, 1998.

Decided Aug. 5, 1999.

Rehearing and Rehearing En Banc
Denied Sept. 30, 1999.*

---

* Judge Ryan would grant rehearing for the reasons stated in his dissent.

554

Mark S. Colucci (argued and briefed), Youngstown, OH, for Plaintiff–Appellant.

Robert S. Walker (briefed), John W. Edwards, II (argued), , Mary Jordan Hughes (briefed), Jones, Day, Reavis & Pogue, Cleveland, OH, for Defendant–Appellee.

Before: RYAN, DAUGHTREY, and LAY,[**] Circuit Judges.

DAUGHTREY, J., delivered the opinion of the court, in which LAY, J., joined. RYAN, J. (pp. 569–72), delivered a separate dissenting opinion.

## OPINION

DAUGHTREY, Circuit Judge.

Marilyn Williams sued General Motors Corporation, her employer for more than 30 years, alleging sexual harassment under Title VII of the Civil Rights Act, 42 U.S.C. §§ 2000e *et seq.* The district court granted summary judgment to General Motors, finding that the incidents of alleged sexual harassment, while offensive, were not so severe or pervasive as to constitute a hostile work environment under the standard set out in *Harris v. Forklift Systems, Inc.*, 510 U.S. 17, 114 S.Ct. 367, 126 L.Ed.2d 295 (1993). The court further found that Williams had not alleged a prima facie case of retaliation under Title VII.

We affirm the grant of summary judgment on the retaliation claim. With respect to the hostile-work-environment claim, however, we conclude that the alleged incidents, seen in context, create a material question of fact as to whether the conduct was sufficiently severe or pervasive to give rise to a violation of Title VII, and we therefore reverse the grant of summary judgment on that claim. Moreover, because we believe the district court employed an incorrect analysis in concluding that Williams had not alleged conduct sufficient to sustain a finding of a hostile work environment, we write to clarify the appropriate analysis for hostile-work-environment claims.

## PROCEDURAL AND FACTUAL BACKGROUND

The plaintiff, Marilyn Williams, began working at General Motors Corporation's

[**] The Honorable Donald P. Lay, Circuit Judge of the United States Court of Appeals for the Eighth Circuit, sitting by designation.

Delphi–Packard Plant in Warren, Ohio, in 1965 or 1966. Over the years, she worked in various departments. From September 1994 until May 1996,[1] Williams worked in the tool crib, a warehouse used to store materials and components used at the plant, from which materials were distributed by an attendant to assemblers who requested them. In May 1995, Williams was transferred to the third, or "midnight shift," to fill a vacancy caused by another employee's retirement.

While working the midnight shift in the crib, Williams alleges that she was subjected to sexual harassment in the form of a hostile working environment. As summarized by the district court in its memorandum opinion, she alleged the following:

1. Don Giovannoe, an hourly tool crib employee, constantly used the "F-word" as part of his vocabulary.

2. In June of 1995, as Giovannoe approached the window at the counter of the tool crib, Appellant heard him say, "Hey slut."

3. In July of 1995, Pat Ryan, her general supervisor, while talking to Williams' co-worker, Dodie, looked at Williams' breasts and said something to the effect of "You can rub up against me anytime." He also said, "You would kill me, Marilyn. I don't know if I can handle it, but I'd die with a smile on my face."

4. A few days after the incident alleged in No. 3, Williams was bending over and Ryan came up behind her and said, "Back up; just back up," or "You can back right up to me," or words to that effect.

5. On another occasion, in July of 1995, Williams was sitting at her desk writing the name "Hancock Furniture Company" on a piece of paper. Ryan came up behind her, put his arm around her neck and leaned his face against hers, and said, "You left the dick out of the hand."

6. Workers conspired against her: she was forced to take the midnight shift when Steve Bivolesky retired, even though Don Giovannoe had originally agreed to take the job.

7. In September of 1995, when she came in for her midnight shift, she discovered a box of tool crib release forms glued to the top of her desk.

8. Later on the same day she discovered the box glued to her desk, Williams claims to have heard Giovannoe say, "I'm sick and tired of these fucking women." As Williams waited on people at the crib window, Giovannoe came over to the desk and threw a box on it. Williams and Giovannoe got into a verbal altercation ending with Giovannoe throwing another couple boxes, the last of which grazed Williams' [sic] hip, but did not hurt her.

9. Williams claims that she was denied overtime.

10. She complained that she was the only person who did not have a key to the office.

11. Williams stated that she was the only person denied a break.

12. She was not allowed to sit at the table at the window of the crib, but had to go in the back instead.

13. One night when Williams came to work she found a buggy (a motorized cart used to haul supplies) sitting on a wooden skid and blocking the other buggies. She had to find a co-worker to help her move it.

14. On one occasion a female hourly worker, Shalimar Kufchak, padlocked the crib's main entrance while Williams was inside.

15. On a couple of occasions materials were stacked in front of the alternate exit, blocking access in and out.

---

**1.** In May 1996 she was elected to a full-time union representative position. She continues to hold this position.

In May 1996, she filed suit against General Motors, alleging sexual harassment under Title VII of the Civil Rights Act, 42 U.S.C. §§ 2000e *et seq.,* and under Ohio state law. She also alleged retaliation under Title VII for having filed sex and race discrimination charges with the Ohio Civil Rights Commission in 1995.

The district court granted summary judgment to General Motors on both the federal and state claims, finding that the incidents of alleged sexual harassment, while offensive, were not so severe or pervasive as to constitute a hostile work environment under the standard set out in *Harris v. Forklift Systems, Inc.,* 510 U.S. at 21, 114 S.Ct. 367, and also that Williams had failed to meet the subjective test under *Harris.* The court further found that Williams had failed to establish that her transfer to the midnight shift constituted an adverse employment action and, therefore, had not alleged a prima facie case of retaliation under Title VII.

### ANALYSIS

### I. Standard of Review

We review *de novo* a district court's grant of summary judgment under Fed. R.Civ.P. 56. *See City of Mt. Clemens v. United States Envtl. Protection Agency,* 917 F.2d 908, 914 (6th Cir.1990). Summary judgment is appropriate only if there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. *See Celotex Corp. v. Catrett,* 477 U.S. 317, 322–23, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); Fed.R.Civ.P. 56(c). In reviewing a summary judgment motion, we must construe the evidence and all inferences to be drawn from it in the light most favorable to the nonmoving party. *See Smith v. Hudson,* 600 F.2d 60, 66 (6th Cir.1979). "Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986).

### II. Hostile Work Environment

■ Title VII of the Civil Rights Act of 1964 prohibits an employer from discriminating "against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e–2(a)(1). A plaintiff may establish a violation of Title VII by proving that the discrimination based on sex created a hostile or abusive work environment. *See Meritor Savings Bank v. Vinson,* 477 U.S. 57, 66, 106 S.Ct. 2399, 91 L.Ed.2d 49 (1986); *Black v. Zaring Homes, Inc.,* 104 F.3d 822, 825 (6th Cir.) *cert. denied,* —— U.S. ——, 118 S.Ct. 172, 139 L.Ed.2d 114 (1997). Discrimination in this form occurs "[w]hen the workplace is permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." *Harris,* 510 U.S. at 21, 114 S.Ct. 367 (citations and internal quotation marks omitted).

■ The Supreme Court has recently reaffirmed the "severe or pervasive" test—*Harris's* core holding—in *Faragher v. City of Boca Raton,* 524 U.S. 775, 118 S.Ct. 2275, 2283, 141 L.Ed.2d 662 (1998), and *Burlington Industries, Inc. v. Ellerth,* 524 U.S. 742, 118 S.Ct. 2257, 2265, 141 L.Ed.2d 633 (1998). Moreover, these cases invalidate a portion of prior caselaw in this circuit and require that we recast the analytical framework for a hostile-work-environment claim based on a supervisor's actions. Previously, to establish such a claim, a plaintiff had to show not only that (1) she was a member of a protected class; (2) she was subject to unwelcomed sexual harassment; (3) the harassment was based on her sex; and (4) the harassment created a hostile work environment; but also that (5) the supervisor's harassing actions were foreseeable or fell within his or her scope of employment, and the employer failed to respond adequately and effective-

ly. *See Kauffman v. Allied Signal, Inc.*, 970 F.2d 178, 183–184 (6th Cir.1992). After *Faragher* and *Burlington Industries,* however, it is no longer enough for an employer to take corrective action; employers now have an *affirmative duty* to prevent sexual harassment by supervisors. Once an employee has established actionable discrimination involving "no tangible employment action," *Faragher,* 118 S.Ct. at 2293, an employer can escape liability only if it took reasonable care to *prevent and correct* any sexually harassing behavior. *Id.*[2]

■ The Supreme Court has not ruled on the appropriate requirements for a hostile-work-environment claim stemming from a co-worker's actions. This court has developed a framework adopting the first four elements from the requirements governing harassment by a supervisor, but the fifth element employs a heightened standard for establishing employer liability. To establish employer liability for harassment by a co-worker, a plaintiff must show that the employer "knew or should have known of the charged sexual harassment and failed to implement prompt and appropriate corrective action." *Hafford v. Seidner,* 183 F.3d 506, 513 (6th Cir.1999) (internal quotation marks and citation omitted) (explaining employer liability for both co-worker and supervisor harassment). *See also, Blankenship v. Parke Care Centers, Inc.,* 123 F.3d 868, 872 (6th Cir.1997), *cert. denied,* —— U.S. ——, 118 S.Ct. 1039, 140

L.Ed.2d 105 (1998); *Fleenor v. Hewitt Soap Co.,* 81 F.3d 48, 50 (6th Cir.1996) (the standard "is one of failure-to-correct-after-notice or duty to act after knowledge of harm").

Without addressing the differing standards for employer liability based on the perpetrator of the harassment, the district court granted summary judgment on the hostile environment claim on two grounds: first, that Williams had not alleged conduct that met the "severe or pervasive" threshold test enunciated in *Harris* and, second, that Williams had not "met the subjective test for a sexually hostile work environment because she herself admits that she did not feel threatened or harassed when these various incidents occurred." We conclude, however, that the evidence presented by Williams does raise a genuine issue of material fact as to whether she was subjected to "severe or pervasive" conduct constituting a hostile work environment, and we also conclude that she has adequately alleged the subjective component of the claim. In deciding otherwise, the district court committed several errors in its analysis, en route to dismissing the incidents as "infrequent, not severe, not threatening or humiliating, but merely offensive."

First, the district court disaggregated the plaintiff's claims, contrary to the Supreme Court's "totality of circumstances" directives, which robbed the incidents of their cumulative effect.[3] Second, the dis-

---

2. In *Faragher* and *Burlington Industries,* the Supreme Court signaled a shift from the use of the terms "hostile work environment" and "quid pro quo" in the employment liability context. *Burlington Indus., Inc.,* 118 S.Ct. at 2271 ("the labels *quid pro quo* and hostile work environment are not controlling for purposes of establishing employer liability"). Although these constructs are still relevant to the "threshold question whether a plaintiff can prove discrimination in violation of Title VII," *Burlington Indus., Inc.,* 118 S.Ct. at 2265, once a plaintiff has established actionable discrimination, the inquiry turns on whether a supervisor's harassment culminated in a "tangible employment action," such as "discharge, demotion, or undesirable reas-

signment." *Faragher,* 118 S.Ct. at 2293. If a plaintiff can prove a tangible employment action, liability is automatic; if however, there was no tangible employment action, employers have an affirmative defense to liability, discussed *infra. See Faragher,* 118 S.Ct. at 2292–93. *Burlington Indus., Inc.,* 118 S.Ct. at 2270.

3. As mentioned above, the district court did not separate Williams's allegations of harassment according to the perpetrators in order to apply the distinct standards for liability. Instead, as discussed *infra,* the court categorized the harassment by the type of harassing action when determining the existence of a hostile environment.

trict court improperly concluded that the conduct alleged to have created a hostile work environment must be explicitly sexual. Finally, the court misconstrued the requirements of the subjective test.

### A. Totality of Circumstances

■ In determining whether the alleged harassment is sufficiently severe or pervasive to constitute a hostile work environment under the *Harris* standard, it is well-established that the court must consider the totality of circumstances. *Harris*, 510 U.S. at 23, 114 S.Ct. 367 ("whether an environment is 'hostile' or 'abusive' can be determined only by looking at all the circumstances"); *Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 118 S.Ct. 998, 1003, 140 L.Ed.2d 201 (1998); *Faragher*, 118 S.Ct. at 2283; *Black*, 104 F.3d at 826. Justice Scalia, writing for a unanimous court in *Oncale,* recently reaffirmed this principle:

> The real social impact of workplace behavior often depends on a constellation of surrounding circumstances, expectations, and relationships which are not fully captured by a simple recitation of the words used or the physical acts performed. Common sense, and an appropriate sensitivity to social context, will enable courts and juries to distinguish between simple teasing or roughhousing among members of the same sex, and conduct which a reasonable person in the plaintiff's position would find severely hostile or abusive.

*Oncale*, 118 S.Ct. at 1003.

■ In this case, however, the district court divided and categorized the reported incidents, divorcing them from their context and depriving them of their full force. The court's analysis is clearly premised on an impermissible disaggregation of the incidents: "Williams' complaints can be separated into four types: (1) foul language in the workplace; (2) mean or annoying treatment by co-workers; (3) perceived inequities of treatment; and (4) sexually related remarks directed toward [Williams].

The court shall examine each group of complaints below." From this point, the district court proceeded to analyze each allegation within the narrow categories the court had defined.

Of course, when the complaints are broken into their theoretical component parts, each claim is more easily dismissed. For example, after discussing "the first group of complaints," which it termed "foul language in the workplace," the district court stated, "This use of foul language, although not condoned by the Court and though certainly well beyond the boundaries of polite behavior, does not satisfy the test enunciated in *Harris.*" On reviewing Williams's "second class of complaints," characterized as "mean or annoying treatment by co-workers," the district court found that "mean behavior, without more, does not equate to a sexually hostile work environment." Obviously, however, there was more, i.e., the other categories of incidents similarly dismissed. Thus, the issue is not whether each incident of harassment *standing alone* is sufficient to sustain the cause of action in a hostile environment case, but whether—taken together—the reported incidents make out such a case.

■ We recognize that district courts are required to separate conduct by a supervisor from conduct by co-workers in order to apply the appropriate standards for employer liability, the fifth element in a hostile-work-environment-claim. However, the totality-of-the-circumstances test mandates that district courts consider harassment by all perpetrators combined when analyzing whether a plaintiff has alleged the existence of a hostile work environment, the fourth element of a hostile-work-environment claim. The totality of the circumstances, of necessity, includes all incidents of alleged harassment; as such, district courts must not conduct separate analyses based on the identity of the har-

asser unless and until considering employer liability.[4]

▮ Moreover, the totality-of-circumstances test must be construed to mean that even where individual instances of sexual harassment do not on their own create a hostile environment, the accumulated effect of such incidents may result in a Title VII violation. This totality-of-circumstances examination should be viewed as the most basic tenet of the hostile-work-environment cause of action. Hence, courts must be mindful of the need to review the work environment as a whole, rather than focusing single-mindedly on individual acts of alleged hostility. As one court has noted:

> The [severe or pervasive] analysis cannot carve the work environment into a series of discrete incidents and measure the harm adhering in each episode. Rather, a holistic perspective is necessary, keeping in mind that each successive episode has its predecessors, that the impact of the separate incidents may accumulate, and that the work environment created thereby may exceed the sum of the individual episodes.

*Robinson v. Jacksonville Shipyards, Inc.*, 760 F.Supp. 1486, 1524 (M.D.Fla.1991).

▮ The district court in this case concluded that the conduct alleged was "infrequent, not severe, not threatening or humiliating, but merely offensive." We cannot agree. Under the facts as alleged in this case, viewed in their entirety and in their proper context, we believe a rational trier of fact could conclude that Williams was subjected to a hostile work environment. Certainly, at minimum, the allegations raise a question of fact for the jury and were not properly summarily dismissed.

First, Williams's own supervisor, Ryan, made her the target of unwanted and humiliating sexual innuendo. On one occasion he looked at her breasts and said, "You can rub up against me anytime," adding, "You would kill me, Marilyn. I don't know if I can handle it, but I'd die with a smile on my face." On another occasion, he put his arm around her neck and placed his face against hers, and noticing that she had written "Hancock Furniture Company" on a piece of paper, said, "You left the dick out of the hand." Finally, one day while bending over, he came behind her and said, "Back up; just back up." These incidents, which must be taken as fact for purposes of summary judgment, were not merely crude, offensive, and humiliating, but also contained an element of physical invasion.

Second, contrary to the district court's conclusion, we do not view a co-worker's saying "Hey, slut" as merely "foul language in the workplace." In addition, hearing "I'm sick and tired of these fucking women" while the target of a box thrown by a co-worker is not merely "mean and annoying treatment by co-workers." These actions could be viewed by a jury as humiliating and fundamentally offensive to any woman in that work environment, and they go to the core of Williams's entitlement to a workplace free of discriminatory animus.

Third, the "pranks" the district court dismisses, including finding office supplies glued to one's desk, being hit by a thrown box, and being locked in one's work area, must be viewed in their proper context. Rather than constituting merely oafish be-

4. Because the first four elements of hostile-work-environment claim are identical regardless of the harasser, in most circumstances, a court addressing a claim involving both harassment by co-workers and harassment by supervisors can and should conduct a single, unified analysis of the first four elements. At the very least, however, all allegations of harassment must be considered when determining whether the harassment created a hostile work environment. Each incident of harassment contributes to the context in which every other incident occurs; the totality-of-the-circumstances test set forth in *Harris* requires consideration of all incidents, regardless of the perpetrator, when determining the existence of a hostile work environment.

havior, the pranks, seen as part of the "constellation of surrounding circumstances," *Oncale*, 118 S.Ct. at 1003, including the threatening language and sexually aggressive innuendo from a supervisor, could well be viewed as work-sabotaging behavior that creates a hostile work environment.

Of course, the fact that a district court should look at the totality of circumstances and the context of the alleged harassment does not mean that courts can point to long-standing or traditional hostility toward women to excuse hostile-work-environment harassment. At oral argument, Williams's attorney asked the court whether the conduct alleged in this case would be tolerated in our courthouses. We believe it would not, and we reject the view that the *standard* for sexual harassment varies depending on the work environment. Thus, we disagree with the Tenth Circuit decision in *Gross v. Burggraf Const. Co.*, 53 F.3d 1531, 1538 (10th Cir.1995), in which the court reasoned:

> [W]e must evaluate Gross' claim of gender discrimination in the context of a blue collar environment where crude language is commonly used by male and female employees. Speech that might be offensive or unacceptable in a prep school faculty meeting, or on the floor of Congress, is tolerated in other work environments.

We do not believe that a woman who chooses to work in the male-dominated trades relinquishes her right to be free from sexual harassment; indeed, we find this reasoning to be illogical, because it means that the more hostile the environment, and the more prevalent the sexism, the more difficult it is for a Title VII plaintiff to prove that sex-based conduct is sufficiently severe or pervasive to constitute a hostile work environment. Surely women working in the trades do not deserve less protection from the law than women working in a courthouse.

In addition, raising the standard for women in these professions—in essence, requiring that they prove conduct that goes well beyond what is considered objectively hostile in other work environments—is unnecessary, because the objective and subjective tests set forth in *Harris* sufficiently "prevent[ ] Title VII from expanding into a general civility code." *Oncale*, 118 S.Ct. at 1002. A hostile-work-environment plaintiff such as Williams must still establish that her environment was objectively hostile, and also that she subjectively perceived the environment to be hostile. *See Harris*, 510 U.S. at 21, 114 S.Ct. 367; *Faragher*, 118 S.Ct. at 2283. While "[c]ommon sense, and an appropriate sensitivity to social context, will enable courts and juries to distinguish between simple teasing … and conduct which a reasonable person in the plaintiff's position would find severely hostile or abusive," *Oncale*, 118 S.Ct. at 1003, judgments by the court as to a woman's assumption of risk upon entering a hostile environment are improper.

In sum, a work environment viewed as a whole may satisfy the legal definition of an abusive work environment, for purposes of a hostile environment claim, even though no single episode crosses the Title VII threshold. Williams's allegations, taken as a whole, raise a question whether Williams was subjected to more than "genuine but innocuous differences in the ways men and women routinely interact," *Oncale*, 118 S.Ct. at 1003, and therefore summary judgment was inappropriate.

### B. Need Not Be Sexual

The district court opinion also misconstrues the "based on sex" requirement of a hostile-work-environment claim and, in doing so, too narrowly construes what type of conduct can constitute sexual harassment. For example, the court stated:

> Of course there is clearly nothing sexually harassing about the prank of gluing

a box to a desk, misplacing a buggy, locking someone in the crib, or blocking the crib entrance with materials, even if one presumes that they were purposely done with the sole intent of annoying Williams. These are the kind of pranks that go on in some workplaces. They do not, without more, rise to the level of harassment, must less *sexual* harassment.

(Emphasis in original.) About Williams's relationship with the employee who remarked, "I am sick and tired of these fucking women," the district court wrote:

It is fairly clear that there was a conflict of some sort between Giovannoe and Williams which often led to considerable discomfort for Williams in her workplace. While Williams' version of the facts, taken as true for purposes of this motion, might establish *hostility,* there is nothing to show that this was *sexual* hostility.

(Emphasis in original.) Finally, the court described the "sexually-related remarks directed toward Williams" category of alleged harassment as "encompass[ing] what might arguably be true sexual harassment complaints."

 Contrary to the dissent's vehement assertion, the law recognizes that non-sexual conduct may be illegally sex-based where it evinces "anti-female animus, and therefore could be found to have contributed significantly to the hostile environment." *Lipsett v. University of Puerto Rico,* 864 F.2d 881, 905 (1st Cir. 1988). To establish that the harm was "based on her sex," Williams "must show that but for the fact of her sex, she would not have been the object of harassment." *Henson v. City of Dundee,* 682 F.2d 897, 904 (11th Cir.1982).

 Thus, harassing behavior that is not sexually explicit but is directed at women and motivated by discriminatory animus against women satisfies the "based on sex" requirement. *See, e.g., Andrews v. City of Philadelphia,* 895 F.2d 1469, 1485 (3d Cir.1990) ("[T]he offensive conduct is not necessarily required to include sexual overtones in every instance."); *Lipsett,* 864 F.2d at 905 ("[verbal attack,] although not explicitly *sexual,* was nonetheless charged with anti-female animus, and therefore could be found to have contributed significantly to the hostile environment."); *Hall v. Gus Constr. Co.,* 842 F.2d 1010, 1014 (8th Cir.1988) ("Intimidation and hostility toward women because they are women can obviously result from conduct other than sexual advances."); *Hicks v. Gates Rubber Co.,* 833 F.2d 1406, 1415 (10th Cir. 1987) (rejecting narrow definition of sexual harassment that requires predicate acts to be clearly sexual in nature); *McKinney v. Dole,* 765 F.2d 1129, 1138 (D.C.Cir. 1985)("We have never held that sexual harassment or other unequal treatment of an employee or group of employees that occurs because of the sex of the employee must, to be illegal under Title VII, take the form of sexual advances or of other incidents with clearly sexual overtones. And we decline to do so now."). *Cf. Daniels v. Essex Group, Inc.,* 937 F.2d 1264, 1273 (7th Cir.1991) ("Even though the physical threat by Art was not specifically racial in nature, it may be considered as a predicate act in establishing racial harassment in a hostile work environment, because it would not have occurred but for the fact that Daniels was black.").

 Because it appears this court has never explicitly held that non-sexual conduct can constitute harassment "based on sex," we now take this opportunity to join our sister circuits and make clear that the conduct underlying a sexual harassment claim need not be overtly sexual in nature. *Any* unequal treatment of an employee *that would not occur but for the employee's gender* may, if sufficiently severe or pervasive under the *Harris* standard, constitute a hostile environment in violation of Title VII. The myriad instances in which Williams was ostracized, when others were not, combined with the gender-specific epithets used, such as "slut"

and "fucking women," create an inference, sufficient to survive summary judgment, that her gender was the motivating impulse for her co-workers' behavior.[5]

### C. Subjective Test

The district court correctly noted that the test for a hostile work environment has both objective and subjective components. In *Harris*, the Supreme Court wrote:

> Conduct that is not severe or pervasive enough to create an objectively hostile or abusive work environment—an environment that a reasonable person would find hostile or abusive—is beyond Title VII's purview. Likewise, if the victim does not subjectively perceive the environment to be abusive, the conduct has not actually altered the conditions of the victim's employment, and there is no Title VII violation.

*Harris*, 510 U.S. at 21–22, 114 S.Ct. 367; *see also Faragher*, 118 S.Ct. at 2283 (reaffirming the objective and subjective components of the test for a hostile work environment); *see also Black*, 104 F.3d at 826.

The district court misconstrued the requirements of this subjective test, however, when it found as follows:

> Williams also stated that Ryan never threatened her in any way and that she never *felt* physically threatened.... Nor has Williams met the subjective requirement of a hostile work environment claim, i.e. that she actually perceived the environment to be abusive. While aware of GM's policy against sexual harassment, she never complained about Ryan's behavior to anyone but her co-worker, Dodie. She stated that she thought Ryan was joking and that she never felt threatened by him. She never told Ryan to stop. In fact, Williams

described Ryan as having a "boyish type personality[.]" He was a person who "joke[d] around a lot with people in the work place."

The district court turns the subjective test on its head, substituting Ryan's possible intended result—to "banter," albeit crudely—for the plaintiff's perception. *The subjective test must not be construed as requiring that a plaintiff feel physically threatened.* Instead, the victim must "subjectively perceive the environment to be abusive," *Harris*, 510 U.S. at 21, 114 S.Ct. 367, which we believe Williams has sufficiently alleged. Even though, as the district court noted, Williams thought Ryan was joking, the intent of the alleged harasser is irrelevant in the court's subjective prong analysis. The fact that Williams thought that *Ryan* meant his comments to be a joke does not necessarily mean that *Williams perceived* them as a joke. Simply put, humor is not a defense under the subjective test if the conduct was unwelcome.

In addition, the subjective component of the prima facie case does not require that a plaintiff report a hostile work environment. A plaintiff can be subjected to sexual harassment sufficiently severe or pervasive as to constitute a hostile environment and yet, for a number of valid reasons, not report the harassment. Williams's reluctance to report the incidents is entirely understandable considering that one of the alleged aggressors was her supervisor and she wanted to get along at work. *See, e.g., Faragher*, 118 S.Ct. at 2291 (noting that a victim of sexual harassment "may well be reluctant to accept the risks of blowing the whistle on a superior"). In her deposition, when asked if she felt physically threatened or scared of Ryan, the plaintiff answered:

---

5. For example, about the admittedly non-sexual box throwing incident with Giovannoe, Williams stated: "Even when Gio[vannoe] threw the box at me, nobody comes, they don't want to talk to me. So I begin to feel

like I didn't have anybody there." As this statement so clearly illustrates, non-sexual abuse can undermine competency as much as explicitly *sexual* harassing behavior.

No. I felt because he was my general supervisor, because everything had gone on, and *I felt like they were trying to push me out.* And I was trying so desperately to get my 30 years in. But not like he was going to hit me or do something like this to me. But because so many things were going on to me on a daily basis, it was like, I don't want to make any waves, just let me get through this because I was going home and telling my husband about this every day, and I said, you know, I can't you know, who can I complain to.

Even when Gio[vannoe] threw the box at me, nobody comes, they don't want to talk to me. So I begin to feel like I didn't have anybody there.

(Emphasis added.)

 Even though a plaintiff's failure to report alleged harassment is not relevant to our analysis of the threshold question—whether the plaintiff in this case has established a hostile work environment—it may, of course, be relevant to the affirmative defense to employer liability in cases of harassment by a supervisor recently adopted by the Supreme Court in *Faragher* and *Burlington Industries,* and to the establishment of employer liability in co-worker harassment cases under *Blankenship.* In *Faragher* and *Burlington Industries,* the Supreme Court held that an employer is vicariously liable for a hostile work environment created by a supervisor, subject to an affirmative defense with two elements:

(a) that the employer exercised reasonable care to prevent and correct promptly any sexually harassing behavior, and (b) that the plaintiff employee unreasonably failed to take advantage of any preventive or corrective opportunities provided by the employer or to avoid harm otherwise.

*Faragher,* 118 S.Ct. at 2293; *Burlington Indus., Inc.,* 118 S.Ct. at 2270. The Court further noted that:

While proof that an employer had promulgated an anti-harassment policy with complaint procedure is not necessary in every instance as a matter of law, the need for a stated policy suitable to the employment circumstances may appropriately be addressed in any case when litigating the first element of the defense. And while proof that an employee failed to fulfill the corresponding obligation of reasonable care to avoid harm is not limited to showing an unreasonable failure to use any complaint procedure provided by the employer, a demonstration of such failure will normally suffice to satisfy the employer's burden under the second element of the defense.

*Burlington Indus., Inc.,* 118 S.Ct. at 2270. The district court in this case did not address the issue of employer liability, and neither will we, except to note the Supreme Court's recent expansion of employer liability for harassment by a supervisor in cases not involving tangible employment action and the importance of careful factfinding with regard to the raising of the affirmative defense. *See id.* Such careful factfinding is also required when determining employer liability for co-worker harassment.

 Finally, the district court erred when it concluded that Williams had not met the subjective test because "she cannot establish that the harassment affected her work." Instead of requiring a plaintiff to establish that her work was actually affected by the harassment, "the adjudicator's inquiry should center, dominantly, on whether the discriminatory conduct has unreasonably interfered with the plaintiff's work performance." *Harris,* 510 U.S. at 25, 114 S.Ct. 367 (Ginsburg, J. concurring). To show such interference, "*the plaintiff need not prove that his or her tangible productivity has declined as a result of the harassment. The employee need only show that the harassment made it more difficult to do the job.*" *Davis v. Monsanto Chem. Co.,* 858 F.2d 345, 349 (6th Cir. 1988) (emphasis added).

In sum, the focus of the objective/subjective inquiry should remain on (1) whether a reasonable person would find the environment objectively hostile, and (2) whether the plaintiff subjectively found the conduct "severe or pervasive." We believe that Williams has, at the very minimum, established a question of fact as to whether she subjectively perceived her work environment to be hostile. We further believe that the district court made improper conclusions based on Williams's failure to report officially the alleged incidents, incorrectly applied a "physically threatened" requirement, and erroneously required that the plaintiff establish that her work was "affected" by the harassment.

### III. Retaliation Claim

Williams also alleges that General Motors retaliated against her for filing a complaint with the Ohio Civil Rights Commission. *See* 42 U.S.C. § 2000e–3. A prima facie retaliation claim is established by showing the following:

> (1) that plaintiff engaged in an activity protected by Title VII; (2) that the exercise of [the plaintiff's] civil rights was known by the defendant; (3) that, thereafter, the defendant took an employment action adverse to the plaintiff; and (4) that there was a causal connection between the protected activity and the adverse employment action.

*Wrenn v. Gould*, 808 F.2d 493, 500 (6th Cir.1987).

The gravamen of Williams's complaint is that she was switched to the midnight shift because of her complaints. As the district court correctly found, Williams has not established that a causal connection existed between the protected activity and the alleged adverse employment action:

> Williams has failed to show any of the indices of a constructive discharge and therefore cannot establish that her shift transfer amounted to a constructive discharge. However, even if this court were to conclude that Williams had established constructive discharge, GM has clearly refuted her claim by pointing out that Williams was transferred to the midnight shift after the retirement of another employee pursuant to the terms of the Collective Bargaining Agreement which required that the employee with the least seniority take the job after it was offered to and refused by everyone more senior.

Although Williams admits that she was the least senior person, and that shifts were filled based on seniority, she objects to the fact that Giovannoe, an employee more senior to her, was permitted to retract his acceptance of the transfer to midnights. It is difficult to see how General Motors can be faulted for allowing Giovannoe, a more senior employee who did not have to accept the transfer in the first place, to retract it. Had Giovannoe not originally accepted the transfer, it would have fallen to Williams.

### CONCLUSION

We cannot agree with the district court that, as a matter of law, the conduct alleged in this case was merely offensive and not so severe or pervasive as to constitute a hostile work environment. We find that the conduct alleged, taken as a whole and viewed in its appropriate context, creates a material question of disputed fact as to whether Williams was subjected to a hostile work environment. We also find that Williams sufficiently established that she subjectively perceived her work environment to be hostile. We therefore **REVERSE** the grant of summary judgment on this claim and remand the case for further proceedings.

However, because we conclude that there is no dispute of fact regarding the alleged adverse employment action and its causal link to the discrimination complaint, and no error of law in the district court's ruling on this question, we **AFFIRM** the grant of summary judgment on the retaliation claim.

RYAN, Circuit Judge, dissenting.

Because the majority opinion has so dramatically and radically changed the law in this circuit for actionable sexual harassment under Title VII—and has done so in disregard of United States Supreme Court authority and this circuit's binding precedent—I must respectfully dissent from Part II of the majority's opinion. I have no disagreement with what is written in Parts I and III, and as to those parts of the majority opinion, I concur.

## I.

Unable to state a compelling case under settled Title VII law for overturning the district court's conclusion that there is no justiciable material fact issue in this case sufficient to avoid summary judgment for the defendant, the majority opinion redefines actionable sexual discrimination under Title VII to include harassment that is not based on sex. My sister, with her usual admirable candor and intellectual honesty, declares unmistakably that, in effect, she is taking the law of actionable sexual harassment to a new level. She states:

> Because it appears this court has never explicitly held that non-sexual conduct can constitute harassment based on sex, we now take this opportunity to join our sister circuits and make clear that the conduct underlying a sexual harassment claim need not be overtly sexual in nature. *Any* unequal treatment of an employee *that would not occur but for the employee's gender* may, if sufficiently severe or pervasive under the *Harris [v. Forklift Sys., Inc.*, 510 U.S. 17, 114 S.Ct. 367, 126 L.Ed.2d 295 (1993),]* standard, constitute a hostile environment in violation of Title VII.

Maj. op. at 565.

While I might agree with this statement of the rule in principle, assuming my sister means "concupiscent" conduct when she refers to "overtly sexual" conduct, the court's application of the rule, as explained below, demonstrates a broader gender-based equal protection standard for an award of damages for workplace harassment under Title VII than it might imply at first blush. Not surprisingly, my colleague cites no authority for this remarkable broadening of the *Harris* standard in application, at least no enactment by the Congress, decision by the United States Supreme Court, or precedent from this court. However appealing the majority's views might be to some, the broad new standard my colleagues have conjured here is not a correct application of Title VII sex discrimination law presently on the books. And since this precedent-bound intermediate court of appeals is not sitting *en banc* today, and more importantly, is not the Supreme Court, we have no authority to make these views the law.

It is perhaps worth recalling that Title VII does not establish a cause of action for harassment in the workplace, even harassment targeted at a member of the opposite sex. Nor, as a matter of fact, has Congress authorized an award of damages for workplace harassment that is sex related. What Congress has forbidden in Title VII, as relevant to this case, is workplace harassment that results in *discrimination based on sex*—and then only when the sex-based harassment has created a "workplace ... permeated with '*discriminatory* intimidation, ridicule, and insult' ... that is 'sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment.'" *Harris*, 510 U.S. at 21, 114 S.Ct. 367 (emphasis added) (quoting *Meritor Sav. Bank, FSB v. Vinson*, 477 U.S. 57, 65, 67, 106 S.Ct. 2399, 91 L.Ed.2d 49 (1986)).

## II.

The distinguished and experienced district judge, David D. Dowd, Jr., whose judgment the majority has overturned today, recognized in his carefully written opinion that all harassment of a female in the workplace, however offensive and objectionable, is not actionable sex-based dis-

crimination within the meaning of Title VII. Judge Dowd correctly observed that of the 18 incidents of alleged abuse the plaintiff claims to have suffered, only three or four were of a sexual nature, and the others had nothing to do with sex-based discrimination at all. Judge Dowd recognized that the constant use of the "F-word" in the shop, the denial of keys and breaks, the blocking of buggies and doors, gluing articles to the plaintiff's desk, and throwing a "couple [of] boxes" at the plaintiff are not acts of sexual discrimination. And, absent evidence that these acts were motivated by an intent to harass the plaintiff because of her sex, they did not become so simply because they were targeted at a female who was the victim of other and unrelated abusive remarks that were sex related.

The majority accuses Judge Dowd of misanalyzing this case by "disaggregat[ing] the [18] incidents" and thus improperly separating them into four categories: "(1) Foul Language in the Workplace; (2) Mean or Annoying Treatment by Co–Workers; (3) Perceived Inequities of Workplace Treatment; and (4) Sexually–Related Remarks Directed Toward Williams."

The fact is that the plaintiff herself, in her deposition testimony, "disaggregated" into 18 separate incidents the conduct she alleges amounted to sexual abuse. Judge Dowd very logically grouped the 18, most having nothing to do with sexual harassment, into four common sense, manageable types. But the majority's criticism of the district court's approach to analyzing the case has a purpose: By "aggregat[ing]" the 18 thoroughly disparate incidents into a single group, the majority very nicely advances its thesis that "non-sexual conduct may be illegally sex-based where it evinces anti-female animus." Maj. op. at 565. That is to say, if a female is the target of three or four acts of ridicule or insult of a sexual nature, and, in addition, is the target of other unrelated acts of harassment and annoyance that are sex

neutral, by "aggregat[ing]" them into a single group, the non-sex-based conduct merges with the sex-based conduct, and the resulting whole becomes a pattern of "anti-female animus" amounting to actionable sexual abuse. Thus, under the majority's formula, as a matter of law, an anti-female attitude displaces sexual harassment as the standard for recovery under Title VII.

Of course, the majority is not in the least concerned that Title VII does not proscribe "anti-female animus" at all; rather, it proscribes sex-based discrimination that is so severe and pervasive as to create a working environment that is permeated with discriminatory intimidation, ridicule, and insult—one that alters the victim's "conditions of employment." *Harris*, 510 U.S. at 21, 114 S.Ct. 367. The majority apparently recognizes that the handful of acts of sexual harassment the plaintiff suffered, while thoroughly offensive and objectionable, are plainly not so "severe and pervasive" as to create a hostile working environment, and so it augments them with 12 or so instances of general horseplay, rudeness, buffoonery, and insult the plaintiff has alleged, in order to create what the majority calls an "accumulated effect." Maj. op. at 563.

What the majority refuses to accept is that Congress has not proscribed all workplace harassment, rudeness, insult, and abuse directed at females, or the accumulated effect of these, but only that harassment which is (1) sex-based, and (2) so severe and pervasive as to meet the test of an abusive working environment as defined in *Meritor* and *Harris*. Instead, the majority purports to concoct an inference of discrimination out of evidence that, on its own, does not satisfy the requirements of the law, by combining it with other evidence that does not satisfy the requirements of the law, and is wholly irrelevant to the question of sexual abuse.

### III.

Another mistaken premise critical to the majority's thesis is that the "totality of the

circumstances," as the frame of reference for assessing whether actionable sex discrimination has been shown, does *not* include the nature and character of the workplace environment. In so saying, my colleagues are simply dead wrong. The Supreme Court has made it very clear that the workplace environment indeed is a component of the totality of circumstances to be taken into account in assessing a claim of sexual harassment under Title VII:

> We have emphasized, moreover, that the objective severity of harassment should be judged from the perspective of a reasonable person in the plaintiff's position, considering "all the circumstances." ... In ... [all] harassment cases, that inquiry requires *careful consideration of the social context in which particular behavior occurs* and is experienced by its target. A professional football player's working environment is not severely or pervasively abusive, for example, if the coach smacks him on the buttocks as he heads onto the field—even if the same behavior would reasonably be experienced as abusive by the coach's secretary (male or female) back at the office.

*Oncale v. Sundowner Offshore Servs., Inc.,* 523 U.S. 75, 118 S.Ct. 998, 1003, 140 L.Ed.2d 201 (1998) (emphasis added).

This common sense idea was previously recognized in a sister circuit:

> [W]e must evaluate [the plaintiff's] claim of gender discrimination in the context of a blue collar environment where crude language is commonly used by male and female employees. Speech that might be offensive or unacceptable in a prep school faculty meeting, or on the floor of Congress, is tolerated in other work environments.

*Gross v. Burggraf Constr. Co.,* 53 F.3d 1531, 1538 (10th Cir.1995).

The abusive and insulting conduct of which the plaintiff complains, including particularly the crude sexual innuendo she has described, is indisputably offensive.

One can make a persuasive argument that in a civilized society an employer has an obligation to provide a workplace environment, including a shop or factory, in which respect for the ordinary sensibilities of all men and women—especially women—is assured, and behavior of the kind the plaintiff alleges occurred here is not tolerated. But that is not what Congress has decreed in Title VII, and it is not what the Supreme Court in *Meritor, Harris,* and *Oncale* has declared to be the basis for an award of damages.

The shop floor is a rough and indelicate environment in which finishing school manners are not the behavioral norm. When a female of ordinary civility, sensibilities, and morality walks into a work milieu that may be tastelessly suffused with rudeness, personal insensitivity, crude behavior, and locker room language, she must do so with the understanding that Congress has not legislated against such behavior and such a workplace environment. That is not to say for a moment that an employer is immune from liability for hostile work environment sex discrimination occurring in the factory or shop simply because the environment is *regularly* laced with crude behavior that includes sexual abuse. It means only that the customary "culture," or lack of it, in a particular workplace is a part of the totality of circumstances to be taken into account *in determining* whether the nature and extent of the claimed harassment is so "severe and pervasive" that it has caused the workplace, such as it is, to become permeated with *discriminatory* intimidation, ridicule, and insult and has "*alter[ed] the conditions* of the victim's employment" in that place. *Harris,* 510 U.S. at 21, 114 S.Ct. 367 (emphasis added). Indeed, the very mention of a legal standard that inquires into the conditions of employment presumes that the court will decide the question of pervasiveness in the context of the ordinary conditions of the relevant workplace.

## IV.

Equality of opportunity for women across the entire spectrum of workplace circumstances is a civil right guaranteed in the Constitution and made enforceable through Title VII. And that includes opportunities for employment in occupations and undertakings in which women have not always been involved. That may well mean that in the competition for dedicated, experienced, and skilled female workers, employers will have to establish new, more sophisticated, female-sensitive rules of behavior which heretofore were unknown in many rough and tumble workplace environments. However, in the many occupations in which women now take their rightful places, perhaps for the first time, they may find themselves victims of unwanted, ungallant, inappropriate, and even insulting sex-related attention. But that does not mean that federal appellate courts have been commissioned by Congress to force a heightened level of civility upon the blue collar workplace—or any other, for that matter—by redefining workplace sex discrimination far more broadly than Congress has defined it in Title VII, more expansively than the United States Supreme Court has interpreted it in *Meritor, Harris,* and *Oncale,* or indeed, even more broadly than our precedent has defined it in *Black v. Zaring Homes, Inc.,* 104 F.3d 822, 826 (6th Cir.) (quoting *Baskerville v. Culligan International Co.,* 50 F.3d 428, 430 (7th Cir.1995)), *cert. denied,* —— U.S. ——, 118 S.Ct. 172, 139 L.Ed.2d 114 (1997).

## V.

In summary, it is entirely clear to me, as it was to the district court, that the handful of acts of sex-based harassment suffered by Marilyn Williams, while offensive and deplorable, were not, in the workplace environment in which she found herself, "sufficiently severe or pervasive to alter the conditions of [her] employment and create an abusive working environment." *Meritor,* 477 U.S. at 67, 106 S.Ct. 2399 (internal quotation marks omitted). Of course, the majority implicitly concedes this fact in finding it necessary to reinvent the law of sexual harassment in the workplace consistent with its view of what Title VII *ought* to proscribe. The few acts of sexual harassment of which Williams complains may not properly be augmented by instances of other workplace insult, rudeness, horseplay, and nonsense, having nothing to do with her sex, in order to construct a case of Title VII sexual harassment sufficient to resist summary judgment. The majority's artificial construct— that non-sexual harassment of a female in the workplace can give rise to Title VII sex discrimination liability if it evinces "anti-female animus"—is a radical rewriting of settled Title VII sex discrimination jurisprudence. And if what the majority has done today is not vacated by this court *en banc,* it will surely come to haunt us.