Mattie WASHINGTON, Plaintiff—
Appellant,

v.

EATON CORPORATION,
Defendant—Appellee.

No. 00–1837.

United States Court of Appeals,
Sixth Circuit.

Jan. 9, 2002.

Before COLE and SUHRHEINRICH, Circuit Judges, and COLLIER,* District Judge.

COLLIER, District Judge.

Appellant Mattie Washington ("Washington" or "Appellant") appeals the district court's order granting summary judgment in favor of Appellee Eaton Corp. ("Eaton" or "Appellee") and dismissing her claims of age and race discrimination under the Age Discrimination in Employment Act ("ADEA"), 29 U.S.C. §§ 621 *et seq.*, Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. § 2000e, and the Michigan Elliott–Larsen Civil Rights Act ("Elliott–Larsen Act"), Mich. Comp. Laws §§ 37.2101 *et seq.* Because a fair-minded jury could not return a verdict in favor of Washington based on the evidence she

* The Hon. Curtis L. Collier, United States District Judge for the Eastern District of Tennes- see, sitting by designation.

presented, we AFFIRM the district court's decision.

## I.

Mattie Washington is a fifty-four year old [1] African–American woman who began working as a data entry clerk for the Eaton Corporation in July 1976 (JA at 249). In 1990, she moved to Eaton's Innovations Center in Southfield, Michigan, where she worked as a receptionist (*Id.*). Her immediate supervisor beginning in 1997 was Cheryl McNally (McNally), a thirty-two year old white woman (JA at 11).

In October or November 1998, managers at Eaton's Innovations Centers in Southfield and Milwaukee, Wisconsin were instructed to deal with a budget shortfall by trimming about fifty jobs from their combined workforces of 350 employees (JA at 54, 72). At the time, the human resources manager of the Southfield center was Todd Mayse (Mayse) (JA at 53–54). It was decided (by whom is unclear) the reduction in force would be accomplished by a combination of voluntary severances and layoffs (JA at 54).

Mayse determined the receptionist position Washington held was noncritical and could be eliminated (JA at 54). Mayse reached this conclusion based on his experience with other facilities that operated without a receptionist (*Id.*). He initially recommended the Southfield Innovations Center use a telephone call-in system in place of a receptionist (*Id.*). This recommendation was rejected by upper-level management, which wanted a person staffing the lobby (JA at 54–55). Mayse's second recommendation, which he made in December 1998, was for the receptionist position to be restructured and filled by someone trained in emergency medical services (JA at 55, 253). Eaton's Milwaukee facility uses a contracted security guard trained in emergency medical services as a receptionist (JA at 55).

In December 1998, the Vice President of Eaton circulated a memorandum notifying employees of the plan to reduce the company's work force (JA at 232–33). Eaton first eliminated under performing employees and then offered a special early retirement package to employees who were at least fifty years old and had been with the company for at least ten years (JA at 11, 32). Only individuals in positions deemed noncritical and nonspecialized were offered the early retirement incentive (JA at 54). Washington qualified for the package (JA at 11).

On December 18, 1998, Washington met with McNally and Mayse to discuss the reduction in force (JA at 253). At that meeting, Mayse told Washington she was eligible to take the early retirement package but that the package would be a "one-time deal" (*Id.*). Nevertheless, Mayse told Washington acceptance of the package was wholly voluntary (JA at 55).

Washington met with McNally and Mayse again on January 6, 1999 to receive the early retirement package documents (JA at 55, 253). According to Washington, Mayse told her the receptionist position would be filled with a contract security guard trained in emergency medical services:

> I asked what were they going to do with the position, and he said that they were going to put a security guard from the company that patrols the parking lot to – they were going to outsource it to the security company, and this person would do the duties that I was doing, but they wanted someone with CPR training.

(JA at 119). Washington testified she "didn't believe him" (JA at 120). Mayse

---

1. At the time of her resignation, Washington was fifty-one years old.

also told her she only had forty-five days to accept the offer and that she should consult with a financial advisor and an attorney before making a decision (JA at 121, 255). Washington consulted with the financial advisor but not with an attorney because she "felt [the company] didn't want [her] there" and that "they would have laid [her] off without any special benefits" if she refused the offer (JA at 242, 255). Although McNally admitted that other retirees had harbored the same feeling, Washington offers no evidence of her speculation. She stated in her deposition, "some of the other retirees had the impression that if they did not take [the package], there was going to be another layoff in the not-to-distant future and it would not be the enhanced package or another retirement" (JA at 268). Washington says she did not inquire as to what would happen to her if she refused the early retirement offer and Eaton eliminated the receptionist position (JA at 120–21,127). However, she acknowledged McNally told her the company's offer did not necessarily mean she would be discharged (JA at 121).[2]

Washington accepted the early retirement package on February 16, 1999 by signing a "Participation and General Release Agreement" (JA at 169–74). The release provided, among other things, that Washington had decided to participate voluntarily:

> I understand and agree that my resignation or retirement as a result of participation in the Plan, and the form of benefit selected, are solely the result of my own decisions. I understand that I have the option of not participating in the Plan and continuing my employment

with Eaton Corporation (the "Company"). I understand and agree that I have not reached my decision to participate in the Plan as a result of any threats, coercion or undue influence and have received no promises, inducements or assurances other than those contained in the written material describing the Plan.

(JA at 173). The agreement also provided that Washington released Eaton from all claims and liability in connection with her employment and termination of employment, under state law, Title VII, and the ADEA:

> In consideration of the promises made by the Company under the Plan, I ... fully releases [sic] the Company ... from any and all liability, expenses and remedies of any type, by reason of any act or omission in connection with my employment or termination of employment, including ... claims under Title VII of the Civil Rights Act of 1964, the Age Discrimination in Employment Act of 1967 ... or any other federal, state or local statute or regulation regarding employment....

(*Id.*). In exchange, Washington received a lump sum payment of $120,000 (JA at 122). Washington later testified she signed the release "knowingly and voluntarily" (JA at 118–19). On February 18 or 19, Washington asked McNally if Eaton was going to offer the receptionist position to McNally's sister (JA at 119).[3] She was told the plan was still to out source the position (JA at 119–20). Washington did not exercise the seven-day revocation provision, and her retirement became effective on February 28, 1999 (JA at 120–21).

---

**2.** At the oral argument in this case, counsel admitted Washington did not believe Mayse's or McNally's assurances Eaton's offer was voluntary or that she would not necessarily be discharged if she refused the offer.

**3.** McNally's sister did eventually work in the receptionist position but only on a short-term contract basis until a final decision about the position was made (JA at 187).

Eaton decided in late February or early March that outsourcing the receptionist duties to a security service would be financially unworkable (JA at 74). Instead, it decided to combine the receptionist duties with those of the administrative assistant for human resources, another position that had been eliminated (JA at 56, 74). In March 1999, Eaton posted the newly-constituted receptionist position to internal and external applicants (JA at 68). Washington was not asked to return to the position or come out of retirement (JA at 56). On April 1, 1999, the position was filled by Colleen Cianciolo, a forty-three year old white woman who had previously worked as an administrative assistant in another Eaton division and location (JA at 188).

Upon learning that Cianciolo had taken the position as receptionist, Washington filed a charge with the Equal Employment Opportunity Commission (EEOC) (JA at 124). EEOC examined the release, indicated it would not investigate the charge, and, at her request, issued Washington a right-to-sue letter (*Id.*). On July 13, 1999, Washington filed suit in the United States District Court for the Eastern District of Michigan. Judge Avern Cohen granted summary judgment in favor of Eaton on June 16, 2000, and this appeal follows (JA at 1, 2).

## II.

■ Washington contends the district court erred in granting Eaton's motion for summary judgment, claiming genuine issues of material fact exist as to whether her release of her potential causes of action under the ADEA, Title VII, and the Elliott–Larsen Act was fraudulently induced and, therefore, whether the release should be invalidated. We review a district court's grant of summary judgment de novo, using the same standard applicable to the district court. *Williams v. General Motors Corp.*, 187 F.3d 553, 560 (6th Cir.1999). Although Washington's substantive claims are governed by federal law, the parties agree the issue before us is one of Michigan contract law.

■ A cause of action may be barred by a contractual release. *Cole v. Ladbroke Racing Michigan, Inc.*, 241 Mich. App. 1, 614 N.W.2d 169, 176 (2000). However, such a release will be invalidated if it was fraudulently induced. *Hungerman v. McCord Gasket Co.*, 189 Mich.App. 675, 473 N.W.2d 720, 721 (1991). A plaintiff seeking to invalidate a release based on an allegation of fraud must show the other party to the agreement made some material misrepresentation prior to the execution of the agreement intending to deceive her. *Id.* The plaintiff must also show the other party intended to induce her reliance and that she acted in reliance upon the misrepresentation. *Id.* Hence, an innocent misrepresentation is insufficient to support the invalidation of a release. *Id.* Furthermore, if a release specifically states no representations or inducements had been made, a signatory cannot later claim she signed in reliance upon some representation. *Dresden v. Detroit Macomb Hosp. Co.*, 218 Mich.App. 292, 553 N.W.2d 387, 390–91 (1996); *see also Astor v. International Business Machines*, 7 F.3d 533, 540 (6th Cir.1993). Finally, as with other allegations of fraud, fraudulent misrepresentation requires a showing by clear and convincing evidence. *See Kovacs v. Electronic Data Sys. Corp.*, 762 F.Supp. 161, 166 (E.D.Mich.1990).

Washington asserts Eaton misrepresented a material fact when Mayse told her on January 6, 1999 Eaton planned to replace her position with a contract security guard responsible for emergency duties. Washington offers no probative evidence Mayse intended to deceive her with this information, let alone that his recommendation to his superiors about the receptionist posi-

tion was based on anything other than a good-faith business judgment. Likewise Washington offers no probative evidence Mayse or anyone else told her she would be discharged if she did not accept the early retirement package. On the contrary, she states both Mayse and McNally assured her the offer was voluntary and she would not necessarily be discharged if she refused it. The fact she did not believe their assurances about her job security or Mayse's explanation about the future of the receptionist position belies her claim she acted in reliance on their representations. In any event, on February 16, 1999, Washington signed a release stating Eaton had made no representations to her other than those included in the package. In the release, she also acknowledged she would not lose her job if she declined to participate in the early retirement program. Finally, we note Washington was given forty-five days to consider Eaton's $120,000 early retirement offer and was advised to consult with a financial advisor and an attorney before accepting it and signing the release.

Based on the language of the agreement she signed and the lack of evidence Mayse's representations were intended to deceive, we find Washington's allegation of misrepresentation provides insufficient grounds on which to invalidate the release.[4] Because the release is valid, Washington is barred from pursuing claims under the ADEA, Title VII, or Elliott–Larsen.

## IV.

Because a fair-minded jury could not return a verdict in favor of Appellant based on the evidence she presented, we AFFIRM the district court's decision.

---

4. Washington appears to argue in the alternative the release should be invalidated based on the theory of mutual mistake. However, because she offers no probative evidence Ea-

ton offered her early retirement based on a mistake rather than its effort to downsize, we find that theory provides her no relief from the release.