Loretta CLEMENTS, Plaintiff,

v.

NORTH AMERICAN STAINLESS,
Defendant.

No. CIV.A. 00–40.

United States District Court,
E.D. Kentucky,
at Frankfort.

Sept. 11, 2001.

Stuart E. Alexander, III, William J. Walsh, Tilford, Dobbins, Alexander, Buckaway & Black, Louisville, KY, for plaintiff.

Carl D. Edawards, Jr., William H. Jones, Jr., Leigh Gross Latherow, Gregory L. Monge, VanAntwerp, Monge, Jones & Edwards, Ashland, KY, for defendant.

## ORDER

HOOD, District Judge.

This matter is before the Court on Plaintiff's motion to amend her complaint [Record No. 52], and Defendant's motion for summary judgment [Record No. 64]. The parties have filed their respective responses and replies [Record Nos. 65, 70 and 74]. These matters are now ripe for a decision.

### FACTUAL BACKGROUND

Plaintiff Loretta Clements ("Clements") was employed by Defendant North American Stainless ("NAS") from 1992 until her discharge in 1999. NAS operates a manufacturing facility located in Ghent, Kentucky, where it produces high-quality stainless steel flat-rolled products. During her employment, Clements worked as a technician in the Environmental, or Wet Chemistry, Lab ("Wet Lab") in the Technical Department. There are three labs located in the Technical Department: the Wet Lab, the Mechanical Lab and the Steel Chemistry Lab.

At the time she was hired, until 1995, Clements's supervisor was Eric Jasper ("Jasper"). He has testified that he did not have any problems with her work habits. Towards the end of his time as her supervisor, Jasper stated that Clements began to have attendance problems. When this was brought to her attention, Clements explained that she had just been diagnosed with diabetes. Jasper testified that this did not have a serious impact on

her work, as she made up the missed work.

In 1995, Kirk Brantley ("Brantley") became Clements's supervisor. In his deposition, Brantley testified that Clements was a good worker, but that she had tardiness and absenteeism problems. He also testified that he heard rumors that on the weekends Clements would swipe in, leave for the day, and then come back, swipe out, and go home. When he questioned her about this, she explained that she was leaving to perform work that had to be done outside the lab. Brantley said that he had no evidence that this was not what she was doing. Brantley also testified that he had didn't recall any other complaints about other employees swiping in and leaving.

When employees would miss work, Brantley would allow them to make up that time at a later date. During his supervision of Clements, he testified that he stopped allowing Clements to make up missed work because he felt that she was abusing the privilege by doing it regularly. He also testified that he felt that Clements was using the phone for personal business and conversations, and that he counseled her that the phone was to be used only for company business.

In August of 1997, Tom Haney ("Haney") replaced Brantley as Clements's supervisor and as supervisor of the Technical Department. After he became supervisor, Haney began having conflicts with Deborah Dooley–Rohrer ("Rohrer"), an employee in the Steel Chemistry Lab. Because the Steel Chemistry Lab was so close to the Wet Lab, Clements often overheard loud arguments between Haney and Rohrer. At one point, in March of 1998, Haney asked Clements and Tammy Clark("Clark"), the only other female employee in the Technical Department besides Clements and Rohrer, to write down what they knew about Rohrer. Clark complied with the request, while Clements refused. In August of 1998, Rohrer quit and later filed suit against NAS for sexual harassment. When Anil Yadav ("Yadav"), Haney's supervisor, was investigating Rohrer's complaints against Haney, he questioned the lab technicians, including Clements. His notes indicate that only one employee, Clements, had any complaints about Haney's behavior, and that Clements did not like the way that Haney was treating Rohrer. Clements testified that she told both Yadav and Susan Poling ("Poling"), a Human Resources Department employee, that she did not like the way Haney was treating Rohrer. At some point Haney found out that Clements thought his behavior towards Rohrer was unfair.

Beginning on Aug. 1, 1998, NAS adopted a new time and attendance policy. Under this new policy, employees were assessed points for being tardy or absent. If an employee accumulated 105 points within a year, this could be considered grounds for termination. Around Aug. 5, 1998, Haney called Clements into his office. They discussed Rohrer and then he told Clements that he was going to have a special attendance policy for her and would not allow her to make up time or use her vacation days on a call-in basis when she was sick. Generally, Technical Lab employees were permitted to make up time when they were late or absent, and were sometimes permitted to take paid vacation days when they were sick. By taking a vacation day instead of a sick day, an employee avoided being assessed points. When Clements told Haney that she was going to complain to Poling, he became angry and threatened her that "you do not want to cross me." Haney testified that he did not recall the details of the incident.

Clements complained to Poling and Yadav about the incident. Poling instructed

her to put her complaints in writing, which she did. Yadav's investigation of Clements's complaints about Haney's treatment of her resulted in his September 24, 1998 memorandum to Poling. In this memorandum Yadav lists Clements's complaints and addressed each one in turn. With regard to Clements complaints about the special attendance policy, he states that Haney's explanation for such policy was Clements's past attendance problems and that any technician who abused the privilege of being able to make up hours would be subject to the same policy. Yadav stated that allowing an employee to make up hours would continue to be at the discretion of the supervisor. As for Clements's complaints that Haney did not show her respect and was insulting, Yadav's memo states that he spoke to other technicians about Haney's attitude, and they all felt that Haney treated them with respect and listened to their ideas. He states that he counseled Haney to be more careful with his words and his tone. Clements also complained that Haney discussed too many personal issues with her. Yadav reported that Haney agreed not discuss personal issues with her in the future. Yadav's conclusion regarding the dispute was that Clements did not have any problems with Haney until he began to question her regarding her attendance record, but that since then, she has been very critical of his supervision. He states that both Clements and Haney agreed to treat each other in a more professional manner.

During discovery, Haney produced notes in which he had analyzed the impact the new attendance policy would have had on Clements had it gone into effect at the first of the year. He added up the number of points which she would have received and concluded that between January 1998 and August 1998, she would have accumulated 135 points.

Haney testified that he never implemented the special policy toward Clements, and that there were times after August 1998 that he permitted Clements to make up missed time. Clements testified that Yadav told her that there would not be separate attendance policies, but that she never tested it.

Between August 1998 and May 27, 1999, Clements accumulated 95 points under the new time and attendance policy. Under the new policy, employees received five points for being late, ten points for being absent with an excuse and if an employee was absent without an excuse, the supervisor had the discretion to assess either ten or fifteen points. If an employee accumulated 105 points, this would be grounds for termination. On September 10, 1998, Haney assessed Clements fifteen points when she stayed home to take care of her husband after he had been injured at work, and Haney assessed her fifteen points when she missed work due to icy roads on January 14 and 15, 1999. Haney's memorandum calculating Clements points indicates that Yadav had instructed him to reduce his assessments for these dates from fifteen to ten points, which he did. The memorandum indicates that Haney warned Clements of her excess points and in May 1999 suspended her for two days.

At some point prior to January 7, 1999, Haney proposed moving Clements from the Wet Lab to the Steel Chemistry Lab. He stated that his reasons for proposing this move were due in part to the fact that in the Steel Chemistry Lab he could monitor her productivity more accurately than he could in the Wet Lab. Clements resisted the move because she did not want to lose her seniority she had acquired in the Wet Lab and feared that the work would aggravate her carpel-tunnel syndrom. On May 28, 1999, Haney wrote a memorandum proposing to move Clements into the

Steel Chemistry Lab. In the first draft of the memorandum, Haney lists his reasons for wanting to move Clements and her reasons for not wanting to move. Haney discounts Clements's fear that she will make mistakes and be slow at the work in the Steel Chemistry Lab, by saying that the only way she would know that she would make mistakes and be slow is to do so on purpose. Clements was never actually transferred to the Steel Chemistry Lab, prior to her discharge.

Clements claims that Haney consistently impugned her honesty by questioning the genuineness of her carpal tunnel syndrome, by calling her a liar and dishonest. Furthermore, she has also testified that on a regular basis, Haney would get close to her, in her face and yell at her, leaving her in tears. She testified that she repeatedly complained about Haney's behavior, but that nothing was done about it, and that every time she complained to upper management, Haney got more hostile. Clements recalled that at one point, when he returned from a training seminar, Haney told her that "now I really know the laws so I know what I can and can't get away with, so don't be trying to tell me what I can and can't do anymore."

Clements also complains that Haney discussed to many "personal" things with her and monitored her too closely. After August 1998, Haney kept detailed notes about Clements behavior, noting such things as sources of stress, her financial situation, number of smoke breaks, telephone conversations and what she ate. Haney testified that the reason he took such notes was that Clark had told him that Clements was planning to sue him for emotional distress.

Clements further complains that she received lower personal incentive scores under Haney after Rohrer left in 1998. As part of their compensation, NAS employees receive a "personal incentive bonus" that is based upon two factors: attendance and performance. The performance factor is determined by an employee's supervisor based upon the employee's attitude, work performance, etc.

Haney stated at this deposition that he had received complaints from Clements's co-workers that she was not pulling her fair share of work in the lab. Haney also counseled Clements and her co-workers about excessive phone use for personal long distance calls. Codes were placed on the phone to monitor long-distance calling. The phone records reveal that Clements long-distance personal phone call use continued to be high.

On June 9, 1999, Clements met with Steven Shaver ("Shaver"), head of the Human Resources Department, Yadav and Haney. The purpose of this meeting was to discuss Clements accumulation of points and the reassignment of Clements to the Steel Chemistry Lab. At this meeting, Clements aired her grievances against Haney, and Shaver and Yadav both stated that their only problem with her was her attendance.

Sometime in May or June 1999, Poling found Clements resting on a blanket in a shower stall. When Clements was asked what she was doing, she replied that she felt sick due to some of her medications. She had a clock or stop watch with her so that she would not take more than her allowed ten minute break. At that time, Poling was satisfied by Clements explanation and was not concerned. Later Poling heard that Clements had been bragging that she had pulled one over on Poling when she had been caught in the shower stall. The source of this information seems to have been Clark. Clements denies that she told Clark she had pulled one over on Poling and testified that she was lying down because she become sick due to some new diabetes medication. Later Clark denied to Clements that she had

said this to Haney, Poling or Shaver. But Clark testified at her deposition that Clements had told her after the incident that she had pulled one over on Poling and that she didn't believe Clements had been sick. Clark stated that she told this to Shavers and Poling. Clements recalled that the incident occurred two or three weeks prior to her last day.

Rohrer filed her EEOC Charge of Discrimination on May 14, 1999. On June 17, 1999, Clark was called into an office with Shaver, Poling and Haney, and was asked what she knew about the problems between Haney and Rohrer. Clark asked if Rohrer had filed suit and was told that they were not at liberty to say. She also mentioned the constant friction between Haney and Clements.

On June 22, 1999, Clements was called into Shaver's office and presented with a Last Change Employment Agreement ("Agreement"). The Agreement stated it had been determined that Clements termination was appropriate based on the following incidents:

1. Excessive accumulation of Points under the Attendance Policy.

2. Was found resting in a shower stall in the Technical Department restroom by S.P.

 a. When questioned as to the reason for being in stall, she presented false information.

 b. A blanket/sleeping bag had been place in the stall which indicated that this is not the first incident.

 c. L.C. informed another employee in her work area that she had been caught by S.P. but she got away with the action by presenting false information to S.P.

6. L.C. has been counseled numerous times regarding the misuse of company owned equipment (telephone), however, the excessive use of the telephone for non-company and non-approved calls has continued.

7. L.C. has been reported to leaving work to attend to personal business and logging this time as work time.[1]

The Agreement conditioned Clements continued employment on the following conditions:

1. L.C.'s points shall be adjusted from 100 to 90 under this agreement.

2. L.C. shall make only approved and valid telephone calls from Company Telephones (Supervisor approval required)

3. L.C. will be allowed to take two 10 min. breaks at times and places specified by the area supervisor.

4. L.C. shall not deceive or attempt to deceive any member of management in the future.

5. L.C. shall log only valid work time on her time sheets.

6. L.C. shall adhere to all written and enforced policies of North American Stainless as a condition of this Agreement.

Clements refused to sign the Agreements because she objected that to the characterization and validity of the incidents 2, 6 and 7, and believed that she had not done anything wrong besides her attendance points problems. She also refused to sign the agreement even when NAS offered to include a clause that stated that by signing the Agreement she was not admitting to any of the incidents listed. As a result Clements was terminated from her employment with NAS.

---

**1.** The Last Chance Agreement numbers the incidents as 1, 2, 6, and 7. These should probably be 1, 2, 3, and 4.

Clements filed a charge of discrimination against NAS with the Equal Employment Opportunity Commission ("EEOC") on October 18, 1999. In her EEOC charge Clements alleges that NAS discriminated against her because they discharged her because she was female. As a result of this charge she received a right to sue letter from the EEOC, and this suit followed.

## APPLICABLE STANDARD OF REVIEW FOR SUMMARY JUDGMENT

Under Fed.R.Civ.P. 56(c), summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no issue as to any material fact, and that the moving party is entitled to judgment as a matter of law." The moving party may discharge its burden by showing "that there is an absence of evidence to support the nonmoving party's case." *Celotex Corp. v. Catrett*, 477 U.S. 317, 325, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). The nonmoving party, which in this case is the plaintiff, "cannot rest on [her] pleadings," and must show the Court that "there is a genuine issue for trial." *Hall v. Tollett*, 128 F.3d 418, 422 (6th Cir.1997). In considering a motion for summary judgment the court must construe the facts in the light most favorable to the nonmoving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

## DISCUSSION OF SUMMARY JUDGMENT MOTION

In this case, Clements's charges NAS with violating Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, et seq. and the Kentucky Civil Rights Act, K.R.S. § 344,010, et seq., alleging claims of sexual harassment and discrimination.

## Count 1—Hostile Work Environment Sexual Harassment

 Under Title VII, an employer is prohibited from "discriminating against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's ... sex." 42 U.S.C. § 2000e–2(a)(1). An employer may violate this statute, "[w]hen the workplace is permeated with discriminatory intimidation, ridicule, and insult, that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." *Harris v. Forklift Systems, Inc.*, 510 U.S. 17, 21, 114 S.Ct. 367, 126 L.Ed.2d 295 (1993) (citations omitted).

> In order to establish a hostile work environment claim, an employee must show the following: 1) the employee is a member of a protected class, 2) the employee was subject to unwelcomed sexual harassment, 3) the harassment was based on the employee's sex, 4) the harassment created a hostile work environment, and 5) the employer failed to take reasonable care to prevent and correct any sexually harassing behavior.

*Bowman v. Shawnee State University*, 220 F.3d 456, 463–64 (6th Cir.2000).

 Clements cannot succeed in her claim of hostile work environment sexual harassment because she has not shown that the alleged harassment occurred because of her gender. Title VII does not prohibit all verbal or physical harassment in the workplace; it is directed only at "discriminat[ion] ... because of ... sex" *Oncale v. Sundowner Offshore Serv., Inc.* 523 U.S. 75, 80, 118 S.Ct. 998, 140 L.Ed.2d 201 (1998). Clements does not allege that the any of her supervisors or NAS managers ever made any sexual comments to her, made any sexual overtures, or ever made any comment which would indicate that any action was being taken towards

her because she was female. Her allegations of harassment are based upon Haney's behavior towards her. Essentially she claims that Haney repeatedly questioned her truthfulness, scrutinized her performance for fault, meticulously monitored her at work, spoke to her in a tone and manner that he would not have used with a male employee, and was generally hostile towards her. What Clements fails to show is that any hostility or harassment by Haney towards her was because she was a female. In *Williams v. General Motors Corp.*, 187 F.3d 553 (6th Cir.1999), the Sixth Circuit held:

> *Any* unequal treatment of an employee *that would not occur but for the employee's gender* may, if sufficiently severe or pervasive under the *Harris* standard, constitute a hostile environment in violation of Title VII. The myriad instances in which Williams was ostracized, when others were not, combined with the gender-specific epithets used, such as "slut" and "fucking women," create an inference sufficient to survive summary judgment, that her gender was the motivating impulse for her co-workers' behavior.

*Id.* at 565–566. Clements's claims of alleged harassment don't include any anti-female comments. Although, Clements points to Rohrer's complaints against Haney as proof that Haney was motivated by a dislike for women, she has not presented any proof that Haney's dealings with Rohrer were motivated by a prejudice against women. The types of behavior of which Clements complains indicates a personal conflict between Haney and Clements and not any problem with having a women in the workplace. *See Williams*, at 565.

## Count II—Sexual Discrimination

■ Under the *McDonnel–Douglas/Burdine* analysis to establish a claim for disparate treatment, a plaintiff has the burden of proving by a preponderance of the evidence a *prima facie* case of discrimination. Upon such a showing, the burden shifts to the employer to offer evidence of a legitimate, non-discriminatory reason for its actions. If the employer provides such a reason, the plaintiff must prove that the reason offered is in fact a pretext for intentional discrimination. *Mitchell v. Toledo Hosp.* 964 F.2d 577, 584 (6th Cir.1992) A plaintiff can establish a *prima facia* case by showing that: (1) she was a member of a protected class; (2) she was discharged (suffered an adverse employment action); (3) she was qualified for the position; and (4) a comparable non-protected person was treated better. *See Mitchell v. Toledo Hosp.* 964 F.2d 577, 582 (6th Cir.1992).

■ Clements's claims of disparate treatment cannot survive summary judgment because she has not established a *prima facia* case of discrimination. Clements's complaints pertinent to her disparate treatment claims surround Haney's subjective evaluations of performance for her personal incentive scores, Haney's special attendance policy, Haney's assessment of points against her, and her discharge.

Clements admits that she was told by Yadav that the "special" attendance policy of not allowing her to make up missed work would not be applied and that she never tested whether it would be applied. The record also reveals that in the instances where Clements objects to Haney's discretionary assessment of points, those points were removed by upper management. Therefore, Clements has not shown a *prima facia* case of discrimination with her complaints regarding the "special" attendance policy and Haney's assessment of points, because no actual adverse employment action occurred in these instances.

With regard to Clements's complaints that her incentive scores were lower under Haney's supervision than under previous

supervisors, Clements has not identified a similarly situated non-protected employee who was treated better. Clements has not identified a male co-worker who had her attendance records, who had co-workers complain to the supervisor regarding them, and who received a higher personal incentive score.

Likewise with regards to Clements's claims that her discharge was discriminatory, she cannot succeed because she has not shown that a similarly situated male employee was treated differently.

> It is fundamental that to make a comparison of a discrimination plaintiff's treatment to that of non-minority employees, the plaintiff must show that the "comparables" are similarly-situated *in all respects.* Thus, to be deemed "similarly situated", the individuals with whom the plaintiff seeks to compare his/her treatment must have dealt with the same supervisor, have been subject to the same standards and have engaged in the same conduct without such differentiating or mitigating circumstances that would distinguish their conduct or the employer's treatment of them for it.

*Mitchell,* at 583 (citations omitted). Clements has not identified any male co-workers who had similar attendance and tardiness problems. Nor has Clements presented evidence that co-workers were complaining to their supervisors regarding male co-worker's work habits. Clements did not identify any other co-worker who used the telephone in a similar manner and was not disciplined. Although, Clements argues that other co-workers would use the telephone to make long-distance calls, would leave and run personal errands during work, and also used the shower stall to rest in, she has not identified a single male co-worker who did these things in combination and in combination with attendance problems. There is insufficient evidence to show that a sim-

ilar situated male employee was treated better than Clements.

## Count III—Kentucky Civil Rights Act

Whereas the Kentucky Civil Rights Act was modeled after Title VII, the above discussion of the plaintiff's claims under Title VII applies with the equal effect to plaintiff's claims under the Kentucky Civil Rights Act. *See Wathen v. General Electric Co.,* 115 F.3d 400, 403, fn. 5 (6th Cir.1997).

## MOTION TO AMEND COMPLAINT

■ Under Federal Rule of Civil Procedure 15(a), leave to amend a complaint should be freely given when justice so requires. However, given the late date of the motion to amend, this Court determines that the plaintiff's motion is untimely. The plaintiff had enough personal knowledge of the events upon which she bases her retaliation claim to have been put on notice of the necessity to amend her complaint before this late date. Therefore this Court declines to allow Clements to amend her complaint. In addition, because Clements did not allege a claim of retaliation in her EEOC complaint, she is barred from bringing her retaliation claim under Title VII. *Cheek v. Peabody Coal Co.,* 97 F.3d 200, 202 (7th Cir.1996).

## CONCLUSION

Accordingly, **IT IS ORDERED**:

(1) That Clements's motion for leave to amend her complaint [Record No. 52] be, and the same hereby is, **DENIED**; and

(2) That NAS's motion for summary judgment [Record No. 64] be, and the same hereby is, **GRANTED**.