Sandra M. CLARK and Rhonda R. Knoop, Plaintiffs,

v.

UNITED PARCEL SERVICE, INC., et al., Defendants.

Civil Action No. 3:01CV–659–H.

United States District Court, W.D. Kentucky, At Louisville.

Sept. 30, 2003.

Garry R. Adams, Jr., Thomas E. Clay, Clay, Kenealy, Wagner, Adams & Hall, Louisville, KY, for Plaintiffs.

Kathleen Biggs Wright, Susan C. Lonowski, Winston E. Miller, Frost, Brown, Todd, LLC, Marvin R. O'Koon, Gray & Weiss, Henry M. Burt, O'Koon & Hintermeister, Louisville, KY, for Defendants.

## MEMORANDUM OPINION

HEYBURN, Chief Judge.

Plaintiffs bring a claim of sexual harassment in the form of a hostile work environment under the Kentucky Civil Rights Act as well as a claim of outrageous conduct under Kentucky common law against their employer, United Parcel Service, Inc. ("UPS"). After all discovery was completed, UPS filed a motion for summary judgment on each claim. Having carefully considered both parties' arguments, the Court concludes that Plaintiffs cannot show that UPS should be vicariously liable for the actions of its employees charged here and that Plaintiffs have not shown outrageous conduct by UPS. Therefore, UPS is entitled to summary judgment on all counts.

## I.

Plaintiffs' factual allegations and UPS's anti-harassment policy provide the factual background for this case. The Court summarizes Plaintiffs' allegations and the evidence most favorably as follows:

### A.

UPS hired Rhonda Knoop ("Knoop") in 1990. In February 1998, she began working in the Air Cargo Resolution Group investigating lost packages. Eli Brock ("Brock") was the manager of that group from the time Knoop began working in that department until August 2001. Knoop's supervisor Dave Roller ("Roller") reported to Brock. Knoop alleges that Brock harassed her in the following situations between 1998 and 2001:

1. In January 2001, Knoop was wearing jean overalls for a "dress down day." As she passed Brock in the hallway, Brock asked "What do you have on? ... What do you have on underneath your overalls?" In the hopes that he would be embarrassed and leave her alone, Knoop replied sarcastically: "If you must know, I have a thong on." Brock then grabbed the back of Knoop's overalls in a way that suggested he was trying to look down her overalls. This incident occurred in the presence of supervisor Roller.

2. On two occasions, Brock approached Knoop at UPS with his vibrating pager, placing it against her upper thigh, and asked if it felt good.

3. Knoop recalls Brook telling inappropriate jokes that were sexual in nature.

UPS hired Sandra Clark ("Clark") in 1993. Since August 1999, Clark has worked as an administrative assistant in the Claims Department. Brock was the manager of that department from the time of Clark's transfer until August 2001. Clark's supervisors Jeannie Riggons ("Riggons") and Roller reported to Brock. From the descriptions related in Plaintiffs' briefs, it appears that supervisors Larry West ("West") and Joe O'Bryan

("O'Bryan") also reported to managers at Brock's level.[1] During this two-year period, Clark alleges that Brock harassed her in the following situations:

1. In 1999, at a UPS departmental luncheon, Brock approached Clark and asked, "Do you want some chips?" Clark responded, "Yeah, sure." Brock then picked up a bag of chips and placed them in front of his crotch, waiting for a response from Clark. Brock made this gesture in front of supervisor West.

2. In 1999, Brock approached Clark in the hallway and said to her, "Oh, by the way, you did a good job in my dream last night." Brock used words to this effect on at least one other occasion.

3. In 1999, Brock showed Clark a sexually suggestive e-mail that she believes depicted "two cartoons screwing."

4. In 1999, Clark told Brock that she needed to have a business meeting with him. In response, Brock asked, "Do you want to go somewhere private?" She responded, "Yes." At that moment, Clark and Brock were standing by a large storage closet, and Brock replied, "What about the closet?"

5. Clark and other members of the Claims Department were relocated at UPS in April 2000. Brock and remaining department personnel were relocated in August 2000. Upon arriving at the new location, Brock approached Clark at the copy machine, brushed his shoulder against hers and said to her, "This is the first time we've been alone since you guys moved over here."

6. In August 2000, Clark was talking to her supervisor Riggons at her desk partition. Brock walked up behind Clark, reached out and scratched the partition where Clark's breasts were located. Brock and Riggons began laughing.

7. The day after the incident at the partition, Clark was talking to Riggons about a shipment of cherries. Brock overheard the conversation, leaned against Clark's back, and whispered in her ear that he was jealous she was talking about cherries with Riggons. This incident occurred in front of Riggons.

8. In 2001, Brock approached Clark's work cubicle and started to ask her about a work matter. When she turned to his direction, he tossed his vibrating pager "between her legs" and asked her, "Does that feel good?" On another occasion, Brock placed his vibrating pager on the area around Clark's waist as he passed her in the hall.

9. In 2001, Clark was standing near a printer outside Brock's office when Clark noticed that Brock was staring at her. She asked, "What are you looking at?" He replied, "I was just enjoying the view."

10. On several occasions, when Clark passed Brock as she was leaving work, he would stick up his hand in a "high-five" motion and say, "See you later." On two occasions, when Clark raised her hand to respond to Brock's "high-five," he grabbed her hand and scratched the palm of her hand with his finger. On one occasion, she tried to avoid having Brock grab her hand. Brock then grabbed her by the arm, twisted it, and again rubbed her palm with his finger.

**B.**

UPS maintains and publicizes a Professional Conduct and Anti–Harassment Poli-

---

1. The Court has pieced together these facts to the best of its ability from the facts presented in both parties' briefs. UPS stated that Riggons and Roller reported directly to Brock. Plaintiffs did not contradict this fact. From the facts presented by Plaintiffs, supervisors West and O'Bryan appear to be at the same level of management as Riggons and Roller and thus either reported to Brock or another individual of similar rank.

cy that creates several avenues for reporting sexual harassment. The UPS policy states that sexual harassment is unlawful and offers examples of various types of objectionable conduct. It also outlines a reporting procedure that provides employees with direct communication to appropriate management personnel for the investigation of complaints. The policy permits employees to report harassing behavior to a supervisor or manager, a Human Resources representative, the Human Resources manager, the Employee Relations Manager, or by using an anonymous toll-free help line to file complaints. UPS publishes its sexual harassment policy in a variety of company policy books and manuals, and the policy is posted on employee bulletin boards in every UPS facility. UPS also provides training about the company's sexual harassment policy to all employees.

Both Knoop and Clark were aware of the policy and the methods and procedures through which they could report sexual harassment. Indeed, they received, reviewed, and signed a copy of the UPS Professional Conduct and Anti–Harassment Policy. Both Knoop and Clark knew that they could report Brock's misconduct and that several avenues were available to do so. Neither Knoop nor Clark, however, actually reported the inappropriate conduct through the prescribed procedure until July 31, 2001.

At that time, Jennifer Robbins ("Robbins") was assigned to investigate charges that Brock was making inappropriate promises to a trucking company contractor of UPS. In the course of that investigation, Robbins spoke with Knoop sometime around July 31, 2001. During that interview, Knoop told Robbins about several instances of inappropriate behavior by Brock toward her and Clark. After that conversation, Robbins met Knoop at a restaurant on August 8, 2001 to discuss the harassment claims further. Knoop provided a written statement about the overalls incident.

About the same time, Robbins also spoke with Clark regarding Brock's outside business affairs. Having heard from Knoop that Brock had also harassed Clark, Robbins asked to meet Clark another time to discuss these claims further. Robbins and Clark met at a restaurant on August 13, 2001 where Clark told Robbins about several incidents concerning Brock's inappropriate conduct and gave Robbins a written statement about them.

Robbins also spoke with several other female UPS employees who complained about Brock's objectionable behavior. Robbins concluded her investigation in mid-August 2001, and reported her findings to her supervisor, Jeff LeMaster. After Robbins concluded her interviews, Brock was sent home. On August 24, 2001, a few department heads at UPS reviewed the results of the investigation, and as a result of that review, Brock resigned under threat of discharge.[2]

Plaintiffs assert that UPS supervisory employees were aware of Brock's conduct prior to Robbins's investigation. Some of the incidents involving Knoop and Clark occurred in the presence of company supervisors who were subordinate to Brock. Brock also exhibited similar behavior with other women in the office in front of UPS management personnel.[3] Finally, Clark

---

2. The record does not contain a statement of the precise reasons for Brock's resignation nor the nature of the ultimate charges against Brock.

3. Plaintiffs assert that "Brock made inappropriate comments to females in the office in front of upper management." But Plaintiffs do not specify what kinds of comments were made or the name or title of the person in front of whom they were made.

complained directly to three different UPS supervisors about Brock's behavior. After the August 2000 incident when Brock scratched the partition, Clark asked Riggons how Brock was able to "get away with this." Clark questioned Riggons in a similar manner after Riggons witnessed the "cherries" incident the day after the incident at the partition. In addition, in 2000, after Brock made a sexually explicit remark in supervisor O'Bryan's presence, Clark asked O'Bryan why nobody "sa[id] anything to [Brock]" when he made "these types of comments" and how he could "get away with this." Clark also recalls complaining in a similar fashion to Roller at some point in 2001. In response to Clark's complaints, she says that all three UPS supervisors "shrugged their shoulders" and did not give any response other than "I don't know."

## II.

■ The proper legal standard to be applied in this case is the standard for summary judgment under the Federal Rules of Civil Procedure. The Sixth Circuit has rejected the argument that the Kentucky standard for summary judgment applies in diversity cases removed to federal court. *Gafford v. Gen. Elec. Co.*, 997 F.2d 150, 165–66 (6th Cir.1993). The Sixth Circuit drew a distinction between procedural rules and substantive law. *Id.* (citing *Reid v. Sears, Roebuck & Co.*, 790 F.2d 453 (6th Cir.1986)). The federal rules "are the rules of practice which apply to civil actions in the federal courts" regardless of whether the action is before the court on federal question or diversity jurisdiction. *Id.* (quoting *Reid*). Summary judgment is a procedural device, and as such, the federal rules control. *Id.* (citing *Reid*).

Under the federal rules, summary judgment is proper if the evidence submitted shows that "there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). In applying Rule 56(c), a court views the evidence in a light most favorable to the non-movant. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). A court properly enters summary judgment where there is not sufficient evidence in support of the non-movant's case to find that "a reasonable jury could return a verdict for the nonmoving party." *Id.* at 248, 106 S.Ct. 2505.

## III.

Plaintiffs bring their hostile work environment claims under the Kentucky Civil Rights Act ("KCRA"). Even though Plaintiffs' claims are under state law, the Kentucky Supreme Court has held that sexual harassment claims under the KCRA are to be analyzed consistent with claims brought under Title VII, the federal counterpart to the KCRA. *Ammerman v. Bd. of Educ. of Nicholas County*, 30 S.W.3d 793, 797–98 (Ky.2000); *Meyers v. Chapman Printing Co.*, 840 S.W.2d 814, 821 (Ky.1992).

■ To succeed on a hostile work environment claim in a supervisor harassment case, a plaintiff must show that (1) she is a member of a protected class; (2) she was subjected to unwelcome harassment; (3) the harassment was based on her sex; (4) the harassment created a hostile work environment; and (5) the employer is vicariously liable for the supervisor's actions subject to an affirmative defense the employer may raise under the Supreme Court's decisions in *Burlington Industries, Inc. v. Ellerth* and *Faragher v. City of Boca Raton. Williams v. Gen. Motors Corp.*, 187 F.3d 553, 560–61 (6th Cir.1999); *see also Hafford v. Seidner*, 183 F.3d 506, 513 (6th Cir.1999) (applying same framework in race and religion harassment case). Both Knoop and Clark satisfy the first three elements required to establish a

hostile work environment claim: they are members of a protected class; they were both subject to unwelcome harassment by Brock; and Brock's harassment towards them was sex-based. Elements four and five, however, present more formidable, and ultimately insurmountable, factual and legal obstacles.

## IV.

■■■■ To show a hostile work environment, the alleged conduct must be "sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21, 114 S.Ct. 367, 126 L.Ed.2d 295 (1993) (internal quotation marks omitted). The totality of the circumstances determines whether a hostile work environment exists. *Id.* at 23, 114 S.Ct. 367; *Williams*, 187 F.3d at 562. Factors to consider include "the frequency of the discriminatory conduct[,] its severity[,] whether it is physically threatening or humiliating, or a mere offensive utterance[,] ... whether it unreasonably interferes with an employee's work performance," and "[t]he effect on the employee's psychological well-being." *Harris*, 510 U.S. at 23, 114 S.Ct. 367. The harassment should be ongoing and should not consist of isolated or sporadic incidents. *Allen v. Mich. Dep't of Corr.*, 165 F.3d 405, 411 (6th Cir.1999). As the Supreme Court stated in *Faragher*, Title VII is not meant to be a "general civility code," and "the sporadic use of abusive language, gender-related jokes, and occasional teasing" are not sufficient to establish liability under Title VII. 524 U.S. 775, 788, 118 S.Ct. 2275, 141 L.Ed.2d 662 (1998). "[C]onduct must be extreme to amount to a change in the terms and conditions of employment...." *Id.* In addition, a plaintiff must show that the working environment was objectively and subjectively hostile or abusive. *Harris*, 510 U.S. at 21–22, 114 S.Ct. 367. Behavior that is not severe or pervasive enough to create a working environment that a reasonable person would find hostile or abusive or that the victim does not subjectively consider abusive is beyond the reach of Title VII. *Id.*

■■■■ The Court concludes that Knoop's allegations do not describe conduct that is sufficiently severe or pervasive to create an abusive working environment. While Brock's behavior was distasteful and boorish, it falls short of being sufficiently pervasive, hostile, or abusive to support a legal claim of a hostile work environment. Knoop related only three relatively isolated incidents over a period of approximately two and a half years. *Compare Akers v. Alvey*, 180 F.Supp.2d 894, 900 (W.D.Ky. 2001) (recognizing that plaintiff alleged facts sufficient to qualify as hostile work environment in case where plaintiff outlined over thirty specific instances of harassment over a two-month period in which her supervisor made almost daily comments about plaintiff's physique and her sexual history, her sexual relationship with her boyfriend, his desire to have intercourse with plaintiff, or asked plaintiff about her sexual conduct), *rev'd in part on other grounds*, 338 F.3d 491 (6th Cir.2003). Brock's behavior is more analogous to the vulgar jokes and the occasional teasing that, in *Faragher*, the Supreme Court found did not constitute actionable harassment. *See* 524 U.S. at 788, 118 S.Ct. 2275.

Furthermore, the conduct Knoop describes does not rise to the level of harassment that the Sixth Circuit has found actionable in other cases. *See, e.g., EEOC v. Harbert–Yeargin, Inc.*, 266 F.3d 498, 508–09 (6th Cir.2001) (finding hostile work environment where (1) male supervisor grabbed male employee's genitals on two occasions and continued to stalk employee after he reported abuse and was transferred to a new work team and (2) other male co-workers taunted plaintiff re-

peatedly about supervisor's harassment and fact that he was not a "real man" because he had filed a sexual harassment complaint); *Williams*, 187 F.3d at 562–64 (finding hostile work environment where, over a period of about four months, co-worker called female plaintiff a "slut" and declared at a later point he was "sick and tired of these fucking women"; supervisor stared at plaintiff's breasts and said "You can rub up against me anytime," adding "You would kill me … I don't know if I can handle it, but I'd die with a smile on my face"; supervisor came up behind plaintiff and told her, while she was bending over, that she could back right up to him; supervisor came up to plaintiff, put his arm around her neck, and leaned his face against hers and said "You left the dick out of the hand" while she wrote "Hancock Furniture Company" on a piece of paper). In every respect, Knoop's allegations fail to meet the required standard.

■ Clark's allegations, on the other hand, present a closer case. Like her co-Plaintiff, Clark clearly objected to Brock's behavior. Unlike Knoop, Clark details quite a few more incidents, about seventeen in all. But these incidents also occurred over a two-year period of time and are of a similar nature as those related by Knoop. Brock's behavior towards Clark, while similarly offensive and sophomoric, was not physically threatening and was likely more akin to the sporadic teasing and offensive jokes that the Supreme Court in *Faragher* did not find actionable. *See* 524 U.S. at 788, 118 S.Ct. 2275. Furthermore, Brock's behavior towards Clark did not rise to the level of abuse that the Sixth Circuit found actionable in *Harbert–Yeargin. See* 266 F.3d at 508–09. As it turns out, the Court need not reach a decision on this element because the case can be resolved on other grounds.

## V.

■ Under the Supreme Court decisions in *Ellerth* and *Faragher*, an employer may raise a two-fold affirmative defense to show that it is not vicariously liable for a hostile work environment: (1) "that the employer exercised reasonable care to prevent and correct promptly any sexually harassing behavior," and (2) "that the plaintiff employee unreasonably failed to take advantage of any preventive or corrective opportunities provided by the employer or to avoid harm otherwise." *Faragher*, 524 U.S. at 807–08, 118 S.Ct. 2275; *Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 765, 118 S.Ct. 2257, 141 L.Ed.2d 633 (1998).

## A.

■ As to the first part of the defense, UPS took steps both to prevent sexual harassment generally and to correct Brock's harassing behavior specifically towards Knoop and Clark. UPS has a policy that offers a variety of channels, including an anonymous hotline, through which an employee may report sexual harassment outside the supervisory chain of command. The policy is distributed widely among employees, and it is well publicized in UPS facilities. Both Plaintiffs also acknowledge that they were aware of the anti-harassment policy and that they received, reviewed, and signed a copy of the policy.

UPS also acted quickly to remove Brock as soon as Plaintiffs made complaints through official channels. Once Robbins interviewed Knoop and became aware of Brock's behavior, she took steps also to interview Clark and other female UPS employees who had complaints against Brock. After Robbins completed her interviews, Brock was sent home. Within two weeks after Robbins submitted her report to UPS management, members of UPS management met to discuss the situation, and

Brock was permitted to resign under threat of discharge.

Plaintiffs argue, however, that UPS management had notice prior to Robbins's arrival because several supervisors witnessed Brock's harassing behavior towards Knoop and Clark and because Clark commented on his behavior to three supervisors, Riggons, O'Bryan, and Roller. The evidence does not show that anyone higher in management than Brock had knowledge of Plaintiffs' current allegations. As explained below, the Court does not consider the mere knowledge of low-level supervisors to be enough to suggest that UPS management was aware of and therefore was under a duty to correct Brock's behavior.

UPS's established policies and its rapid action to remove Brock once notified about his behavior, show that, as a matter of law, UPS has satisfied the first element of the defense.

**B.**

 As to the second part of the defense, UPS has shown that Knoop and Clark failed to take advantage of UPS sexual harassment notification procedures. Both Knoop and Clark were aware of the UPS anti-harassment policy and the various reporting avenues. Neither Knoop nor Clark used those procedures until July 2001. The Supreme Court has stated that "a demonstration of such failure [to use an established complaint procedure] will normally suffice to satisfy the employer's bur-

den under the second element of the defense." *Faragher*, 524 U.S. at 807–08, 118 S.Ct. 2275; *Ellerth*, 524 U.S. at 765, 118 S.Ct. 2257. On the basis that Knoop and Clark failed to use the established procedures, the second element of the defense appears to be established beyond further argument.

 Notwithstanding this predicament, Knoop and Clark argue that they satisfied the notification requirement because several incidents occurred in the presence of supervisors and because Clark questioned supervisors Riggons, O'Bryan, and Roller about how Brock "could get away with" his behavior to which all three supervisors simply shrugged their shoulders and said "I don't know." [4] The Court respectfully disagrees that these actions were sufficient either to avoid further harm or to satisfy the reporting requirements as required in *Faragher* and *Ellerth*.

 First, the knowledge of low-level management personnel about harassing incidents cannot be imputed to the employer. Here, all of the supervisors who witnessed the harassing incidents or were privy to Clark's comments about Brock's conduct were low-level supervisors. They were subordinates to Brock or a manager at his level and not in a position to reprimand Brock for his conduct or to correct Brock's behavior. The general consensus is that the knowledge of or notice to a low-level employee without authority or power to

---

4. Knoop also states that she did not report the harassment by Brock because she feared she would lose her job if she reported his behavior to Human Resources. Notwithstanding the fact that the UPS anti-harassment policy specifically states that employees who report harassment will not suffer adverse employment action or retaliation, a generalized fear of retaliation is insufficient to excuse an employee from using the prescribed reporting channels. *See Sconce v. Tandy Corp.,* 9 F.Supp.2d 773, 778 (W.D.Ky.1998); *see also Shaw v. AutoZone, Inc.,* 180 F.3d 806, 813 (7th Cir.1999); *Fierro v. Saks Fifth Avenue,* 13 F.Supp.2d 481, 492 (S.D.N.Y.1998). Without evidence that Knoop herself was subjected to retaliatory action or that other employees lost their jobs for reporting sexual harassment, Knoop was under a duty to comply with the reasonable reporting requirements outlined in *Ellerth* and *Faragher*. *See Fierro,* 13 F.Supp.2d at 492.

terminate or address the problem cannot be imputed to the employer. *See, e.g., Torres v. Pisano,* 116 F.3d 625, 634–35 (2d Cir.1997) (actions of "low-level supervisor" in management hierarchy cannot be imputed to employer); *Kotcher v. Rosa & Sullivan Appliance Ctr.,* 957 F.2d 59, 64 (2d Cir.1992) (same); *Williamson v. City of Houston,* 148 F.3d 462, 466 (5th Cir.1998) (notice to employer does not turn on labels in management hierarchy, and "a more important consideration [may be] whether notice was given 'to those with authority to address the problem' "); *Young v. Bayer Corp.,* 123 F.3d 672, 675 (7th Cir.1997) (notice to the proper person can be judged by whether the person complained to "has the authority to terminate the harassment" and "could reasonably be expected to refer the complaint up the ladder" to the personnel able to act on it). This Court agrees with this general precept.

This conclusion is consistent with the Supreme Court's reasoning in *Ellerth* and *Faragher* that one purpose behind the affirmative defense is to encourage employees to report harassment by foreclosing employer liability when they do not take steps to avoid or minimize harm. *Faragher,* 524 U.S. at 806–07, 118 S.Ct. 2275; *Ellerth,* 524 U.S. at 764, 118 S.Ct. 2257. Imputing the knowledge of low-level supervisors to the employer would make meaningless the complaint procedures and the affirmative defense. This Court came to the same conclusion in a similar case. *See Good v. MMR Group, Inc.,* No. CIV. A.3:00CV–182–H, 2001 WL 1772120, at *4 (W.D.Ky. Dec. 4, 2001).[5]

Second, even if the actions of the supervisors involved could be imputed to UPS, Clark's verbal comments to Riggons, O'Bryan, and Roller were too non-specific and informal to constitute proper notice to UPS. Clark did not make any complaint that requested action. Clark did not ask anyone to stop Brock nor did she request that she or Brock be transferred. Her remarks more resembled informal comments about Brock's conduct. This alone would not have put her supervisors on notice of something more serious and pervasive. By allowing informal remarks such as those made by Clark or mere observations about isolated incidents without more information from the complainant to constitute notice, this Court would be ignoring the complaint procedures established by UPS and undermining the purpose of the affirmative defense as stated by the Supreme Court. *See Good,* 2001 WL 1772120, at *4–5.

Accordingly, UPS has demonstrated without doubt that Plaintiffs failed to use the existing complaint procedure until late July 2001. Knoop and Clark therefore each fail as a matter of law to establish employer liability under the fifth required element of their hostile environment claims.

## VI.

Plaintiffs also assert a state law claim of outrageous conduct based on the same facts as their sexual harassment claims. To succeed on a claim of outrageous conduct under Kentucky law, Plaintiffs must satisfy four elements: (1) the

---

**5.** In *Good,* the plaintiff complained of hostile work environment sexual harassment and claimed that her employer, a construction company, had notice of the harassing conduct by her co-workers because a few incidents took place in front of foremen on the construction site. *Id.* The Court ruled that "the knowledge of relatively low-level foremen" should not be imputed to the employer's management personnel responsible for handling sexual harassment complaints. *Id.* The Court reasoned that doing so "would render [the employer's] reporting procedures irrelevant" contrary to the Supreme Court's rulings in *Ellerth* and *Faragher. Id.*

conduct must be "intentional or reckless"; (2) "the conduct must be outrageous and intolerable in that it offends against the generally accepted standards of decency and morality"; (3) a causal connection must exist between the conduct and the emotional distress; and (4) "the emotional distress must be severe." *Humana of Ky., Inc. v. Seitz,* 796 S.W.2d 1, 2–3 (Ky. 1990); *Craft v. Rice,* 671 S.W.2d 247, 249 (Ky.1984) (case first recognizing tort of outrage under Kentucky law).

■■■■ Kentucky courts have construed the common law claim of outrageous conduct quite narrowly. To succeed on a claim of outrage, the defendant's conduct must be "so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community." *Humana of Ky.,* 796 S.W.2d at 3 (quoting *Restatement (Second) of Torts* § 46) (internal quotation marks and emphasis omitted); *see also Pierce v. Commonwealth Life Ins. Co.,* 40 F.3d 796, 806 (6th Cir.1994) (citing *Humana of Kentucky* for same principle); *Lococo v. Barger,* 958 F.Supp. 290, 297 (E.D.Ky.1997) (same), *aff'd in part, rev'd in part on other grounds,* 234 F.3d 1268 (6th Cir.2000). Indignities, insults, unkind words, threats, or annoyances do not rise to the level of outrageous conduct. *Pierce,* 40 F.3d at 806 (finding that insulting, derogatory, and abusive behavior towards harasser by employer in sexual harassment investigation was not outrageous); *Lococo,* 958 F.Supp. at 297–98 ("Although discharging an employee on the basis of gender may be illegal and reprehensible, a great deal more is required to approach outrageous conduct.").

■■■■ Plaintiffs did not respond to UPS's arguments against the claim of outrage, and the Court finds that the alleged behavior here does not support such a claim. Brock's behavior towards Knoop and Clark, while insulting and derogatory, does not constitute the type of behavior that the Court considers "a deviation from all reasonable bounds of decency" and "utterly intolerable in a civilized community." *Humana of Ky.,* 796 S.W.2d at 3 (internal quotation marks omitted); *see Pierce,* 40 F.3d at 799–800 (no outrageous conduct where employer equates harasser during investigation to "a murderer, rapist or child molester"); *Humana of Ky.,* 796 S.W.2d at 3–4 (no outrageous conduct where nurse tells distressed patient, who has just given birth to stillborn child after calling for medical help with no response, to "shut up" and tells same patient, in response to question about where the nurse was taking the stillborn baby, that the hospital would dispose of the dead baby "right here"). Having concluded that no reasonable jury would find outrageous conduct, the Court grants summary judgment to UPS on this claim.[6]

■■■■ Defendant Brock did not file a motion for summary judgment. An individual employee or supervisor, however, may not be held personally liable under the KCRA (Ky.Rev.Stat. ch. 344). *Wathen v. Gen. Elec. Co.,* 115 F.3d 400, 404–05 (6th Cir.1997) (rejecting individual liability under Title VII and holding the same is true under the KCRA since "the substantive legal analysis" under federal and Kentucky civil rights law is "identical"). Accordingly, Plaintiffs' claims against Defendant Brock in his individual capacity are dismissed.

6. Without the foundation of an underlying claim, Plaintiffs' demand for punitive damages fails as well.

The Court will enter an order consistent with this Memorandum Opinion.

## ORDER

Defendant UPS has moved for summary judgment against the claims of Plaintiffs Sandra Clark and Rhonda Knoop. The Court has in a Memorandum Opinion analyzed those claims and concluded that Defendant's motions should be granted. Being otherwise sufficiently advised,

IT IS HEREBY ORDERED that Defendant's motions for summary judgment as to the claims of each Plaintiff are SUSTAINED and all claims against Defendants UPS and Eli Brock are DISMISSED WITH PREJUDICE.

This is a final and appealable order.