NOT RECOMMENDED FOR FULL-TEXT PUBLICATION
File Name: 17a0501n.06

No. 16-4000

## UNITED STATES COURT OF APPEALS
## FOR THE SIXTH CIRCUIT

PAMELA J. DANIELS, et al., )
)
    Plaintiffs-Appellants, )
)
v. )
)
PIKE COUNTY COMMISSIONERS, et al., )
)
    Defendants-Appellees. )
)
)

FILED
Aug 29, 2017
DEBORAH S. HUNT, Clerk

ON APPEAL FROM THE UNITED
STATES DISTRICT COURT FOR THE
SOUTHERN DISTRICT OF OHIO

BEFORE:    DAUGHTREY, MOORE, KETHLEDGE, Circuit Judges.

MARTHA CRAIG DAUGHTREY, Circuit Judge. Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. §§ 2000e–2000e-17, is not a "general civility code for the American workplace." *Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 80 (1998); *see also Faragher v. City of Boca Raton*, 524 U.S. 775, 788 (1998). Consequently, the statutory scheme will not protect employees from all acts of a boorish, callous, condescending, or overbearing supervisor. However, Title VII can, and does, protect the rights of employees not to be subjected to job-related discrimination on the basis of gender, 42 U.S.C. § 2000e-2(a)(1), or to retaliation for making a charge of discriminatory practices. 42 U.S.C. § 2000e-3(a). In this case, plaintiff Pamela Daniels[1] alleges, under both federal and state law, that defendant Charles

---

[1] Although the complaint and the first amended complaint were filed in the names of Pamela Daniels and Rachel Barron, Barron is no longer a party to this appeal.

No. 16-4000, *Daniels, et al. v. Pike County Commissioners, et al.*

Robert (Rob) Junk, Jr.,[2] the Pike County (Ohio) prosecutor, created a hostile work environment in his office and terminated Daniels's employment in the office solely because of her gender, that Junk retaliated against her for reporting the harassment, and that Junk's actions amounted to intentional infliction of emotional distress. In a thorough written opinion, the district court granted summary judgment to Junk on each claim, and Daniels now appeals. For the reasons discussed below, we conclude that Daniels has identified a genuine dispute of material fact that precludes summary judgment for Junk on Daniels's claim of retaliation. Thus, we reverse the district court's decision on that one cause of action but affirm the rest of the district court's judgment.

## FACTUAL AND PROCEDURAL BACKGROUND

Junk hired Daniels as a secretary in the Pike County prosecutor's office in November 1997, a year after he first was elected as county prosecutor. By 2013, Daniels had moved into the victim's-advocate/witness-coordinator position in the office and, at that time, enjoyed a generally good working relationship with Junk.

That relationship began to fray, however, in October 2013 after Junk attended a seminar on restoring public trust in government offices. According to Junk:

> I was sitting there, and it really embarrassed me some of the things [the speaker] said. And I remember what my mom said, "Every time I come [to the prosecutor's office] they are having a party out front." That's embarrassing.
>
> And as luck would have it, that day Allen Smith[, a former United States Marshal,] and I actually had lunch together. We went to a meeting at the Columbus Police Academy with some of the Homeland Security people, and he talked about people in the office not being professional and not dressing well, and how they answered the phone, and things like that.
>
> And I was guilty of basically screwing off at work and getting on the Internet and things like that, too. And I did it on more than one occasion.

[2] The first amended complaint listed both Junk and the Pike County Commissioners as defendants; however, the claims against the commissioners have been dismissed, leaving only Junk as a party defendant.

* * *

But I wanted to do something about it. And it was the straw that broke the camel's back. I talked with Allen about it over lunch, and it's just something that had been building.

When he returned from the seminar, Junk implemented a number of changes that ostensibly were designed to improve the professionalism in the office. Among those changes were requirements that staff work five eight-hour days (8:30 a.m. until 4:30 p.m.)—rather than four ten-hour days, as they had been doing for a period of time—that employees clock into and out of work each day, that staff no longer wear blue jeans or flip-flops in the office, and that office computers be used for business purposes only. Logical rationales were offered for each new guideline. For instance, even Daniels herself admitted that the switch back to the more-traditional five-day work week was warranted because, when scheduled to work four ten-hour days, "there were days people weren't getting their full 10 hours in or working their full 10 hours." Furthermore, Junk deemed use of a time clock necessary because he "was having problems with [Barron and Daniels] showing up on time, wanting to leave early and things like that." Other employees also told Junk that, when he would be in court, "[Daniels] would stroll in around 9:00." Moreover, Junk himself sometimes had to answer the telephones himself because Daniels and Barron "left the office uncovered at times."

Daniels does not dispute that office personnel often wore jeans and flip-flops to work because, up to that point, Junk had not implemented a dress code. After returning from the seminar, however, and in light of comments from Junk's ex-mother-in-law that the officer personnel "never looked professional up front", Junk required that the women wear more-professional office attire—"dress pants, dress clothes, no flip-flops." Daniels "did not have a problem with that at all" and "was more than willing to comply with" the new dress code.

The final component of Junk's effort to improve office productivity involved a directive emphasizing that office computers were to be used for government work only. Even so, Junk did allow the computers "to be used for personal use during lunchtime and after hours." To ensure compliance with the new policy, early one morning, Junk accessed the search histories on the work computers used by the women in the office. When the women arrived for work, the search histories remained on their screens to alert them that Junk indeed had checked on their unauthorized computer usage.

Clearly, none of the remedial measures undertaken by Junk were, in and of themselves, improper. Daniels alleged, however, that the directives were enforced in a discriminatory manner. Specifically, she claimed in her deposition testimony that only the female employees in the office were expected to abide by the 8:30–4:30 workday. But she also conceded, that although the male employees did not work strictly from 8:30 until 4:30, they had been working, and continued to work, five eight-hour days, usually from 7:00 a.m. until 3:00 p.m. Most of the men, who worked outside the office, also were not required to clock in and clock out when beginning and ending their workdays and were allowed to continue to wear jeans while performing their official duties as investigators and diversion officers. Daniels also claimed that Junk accessed the search histories only on the computers used by the female staff. Junk, however, defended that fact by explaining that the layout of the office allowed him to see what one of the male employees was doing on his computer during the day, and another male employee normally was on the road driving individuals to and from court.

Daniels stated that, in addition to the allegedly discriminatory office policies implemented by Junk, the prosecutor engaged in other actions that indicated a desire to treat female employees more harshly than male employees, and Daniels more harshly than even other

female office staff. For example, at some point after requiring employees to clock in upon their arrival at the office, Junk walked among the front-office staff, knowing that only the women employees were required to clock in, and said, "So did everybody get punched in? Everybody working. Nobody whining. That's the way we like it."

On other occasions, Junk allegedly tried to belittle or intimidate Daniels. Once, in the presence of members of the public seeking information in the office, Junk stated, "[T]hese girls have work they need to be doing. I'm just making sure they're doing what they're supposed to do." On another occasion, Junk, while addressing Daniels, said, "Well, there's a song about everything, and one of those songs is 'Get the Fuck Out' by Cee Lo Green."

When Daniels and Barron inquired of their boss why he had accessed the search histories on their computers, Junk reportedly "flipped out and said, 'Don't you two think you can't be replaced'" and "If you're on the internet, then there's things that aren't getting done." However, when pressed by Daniels to identify work that had not been completed, Junk was unable to come up with any instance of such a failure to perform an assigned task.

Daniels also highlighted in her deposition testimony the fact that, after the implementation of the new office dress code, she had asked Junk if she could wait until after the next payday to comply "so that [she] could get some additional clothing" that would fit her. Even though Junk acquiesced to the request, a few days later, prior to the awaited payday, Junk approached Daniels and inquired, "And didn't I say we were going to change the dress code around here? Aren't you wearing jeans?" When Daniels reminded Junk that he had given her additional time to purchase new clothes, he responded, "Well, if you say so," and walked away.

Daniels also alleged that Junk enjoyed tormenting the women working in the office. As an example, she recounted an occasion on which Junk entered the women's work area and

popped a large piece of bubble wrap, causing Daniels to jump in fear.  According to Daniels, Junk engaged in such an action because "he wanted to see us shake or jump; he thought it was funny.  He wanted to upset us.  He did it to upset us.  He enjoyed seeing us upset."

Nor was it only the women in the prosecutor's office who noticed the unequal treatment meted out to the female staff.  Aaron Gullett, a former employee of the Pike County Sheriff's Office, ultimately replaced Daniels in the prosecutor's office and "heard Rob Junk making disparaging comments toward females, including, 'That's why I don't like to hire women,' 'That's why it is a pain to hire women,' and, 'Working with men is so much easier than working with women.'"  Gullett also stated in a sworn affidavit that Junk and Investigator Charlie Reader prodded him to take actions "specifically to annoy or upset Angie Farmer, the only female in the office [after Daniels's employment was terminated] and also a friend to Pam Daniels and Rachel Barron."  Rather than do so, however, Gullett voluntarily left the prosecutor's office after only eight months "because of the things [he] saw and the way [his] employer Rob Junk and his subordinates treated people at his behest."

The event that set into motion the series of acts that ultimately resulted in Junk's termination of Daniels's employment in his office occurred sometime either on or shortly before January 15, 2014.  According to Daniels,[3] she was working at a vacant desk due to a problem with her own printer when Junk called her name.  When Daniels looked up, she saw Junk in the doorway of an office holding an AR-15 rifle[4] and heard him state, "Don't worry.  I'm not that

---

[3] Junk offers a slightly different take on the interaction; however, because this matter comes before us on an appeal from a grant of summary judgment, we view genuinely disputed facts in the light most favorable to Daniels, the nonmoving party.  *See, e.g.*, *Scott v. Harris*, 550 U.S. 372, 380 (2007).

[4] Although Daniels claims in her appellate brief that "Junk waved an assault rifle at her," Appellant's Br. at 9, the record before us does not support that assertion.  Indeed, Daniels testified during her deposition that Junk held the gun with his right hand lower than his left hand, "meaning the gun was being held up in the air."  (Page ID 239)  Moreover, she denied that Junk ever pointed the weapon at her.  (Page ID 239)

mad, ha, ha, ha, ha." Although Junk viewed the entire interaction as some sort of joke, Daniels felt the display of the weapon "was just an intimidation tactic on Rob's part."

On January 15, 2014, Daniels went to the county court for a hearing as part of her duties as a victim's advocate/witness coordinator. While at the court, she spoke with Dominica Hannah, a victim's advocate with the Pike County Partnership Against Domestic Violence, and with Tara Tackett, a deputy in the Pike County Sheriff's Department. During that conversation, Daniels recounted the gun incident and "went on about all the changes and the treatment in the office," disclos[ing] everything . . . [in the hope] that Tara was going to say something" to her superiors so that Junk's actions would come under scrutiny. Tackett indeed did contact Aaron Gullett—then still a sheriff's office employee—who, in turn, contacted his supervisor.

Within minutes, Charlie Reader, an investigator in Junk's office, arrived at the sheriff's offices and took statements from Hannah and Tackett. Shortly thereafter, while Gullett was in Junk's office, Junk "fired Pam Daniels over the phone just a few hours after she reported the incident with the gun to Tara Tackett." Although an intern in the prosecutor's office claimed that Junk had told him that "he was firing Ms. Daniels because she was 'disloyal'", Junk himself explained that he decided to fire Daniels because of the "statements that she made to Tara Tackett and Dominic[a] Hannah," and because of Daniels's "job performance, attitude, arguing with [him] all the time." In fact, Junk claimed in his deposition testimony that Daniels "was probably one of the least motivated people [he had] ever supervised."

Daniels felt that even her termination for her alleged misconduct evidenced the differing treatment accorded men and women in the office. Daniels explained that although she was fired merely for reporting Junk's inappropriate actions, Jason Savage, one of the male diversion officers, was not fired even though he had an ongoing sexual relationship with a woman under

his charge in the diversion program.  Junk conceded that he had heard rumors about Savage's

alleged relationship and had called Savage into his office to confront him with the information.

Savage admitted that he planned to marry the woman—and later did so—but denied that he had

engaged in any inappropriate conduct.  To verify Savage's claim, Junk arranged to have a

tracking device secretly placed on Savage's work vehicle in an effort to document any improper

liaisons by the employee.  However, Junk maintained that he was unable to obtain any evidence

of a relationship, other than mere rumor and opinion, and thus decided to drop the matter.

Daniels eventually filed a complaint and an amended complaint in federal district court,

asserting causes of action against Junk under both Title VII and under the Ohio Civil Rights Act

for creation of a hostile work environment, for termination on the basis of gender, and for

retaliation for exercising a federally protected right.  She also asserted a state-law tort claim

against her former boss for alleged intentional infliction of emotional distress.  Following

discovery, the district court granted Junk's motion for summary judgment, concluding that

Daniels had failed to make out any of her federal or state causes of action.[5]

Addressing Daniels's hostile-work-environment claims, the district court noted that some

of Junk's acts highlighted by the plaintiff were not truly gender-based, but rather were simply

boorish or indicative of the interpersonal conflict between Daniels and Junk.  Nevertheless, the

district court indicated that other acts and attitudes demonstrated the anti-female animus

necessary to proceed with a claim of a hostile work environment.  But ultimately the district

court concluded that even those incidents were sporadic at best, did not involve any physical

---

[5] Claims of gender discrimination based on a hostile work environment and of retaliation under Title VII and those under the Ohio Civil Rights Act are treated identically.  *See, e.g.*, *Hawkins v. Anheuser-Busch, Inc.*, 517 F.3d 321, 322 (6th Cir. 2008) (sexual harassment claims); *Braun v. Ultimate Jetcharters, LLC*, 828 F.3d 501, 510 (6th Cir. 2016 (retaliation claims).

contact or threats, and simply were not severe enough in nature or so objectively hostile "as to alter the terms and conditions of [Daniels's] employment."

Similarly, the district court determined that Daniels's claim of discriminatory termination also fell short of the legal threshold necessary to pursue the cause of action further. Although Daniels did adduce sufficient evidence to establish a *prima facie* case of discrimination, she was unable to prove that Junk's legitimate, nondiscriminatory reason for his employment decision was merely a pretext for invidious, gender-based discrimination.

The district court also concluded that Daniels failed to offer sufficient, detailed evidence that she had made specific claims of harassment or sex discrimination. Consequently, the court held that the plaintiff did not engage in the protected activity that is essential to establishing a claim of Title VII retaliation.

Finally, the district court noted that a plaintiff may not succeed on an Ohio tort claim of intentional infliction of emotional distress unless that plaintiff establishes that the defendant's conduct was so outrageous as to be considered intolerable in civilized society. Because Daniels failed to satisfy that onerous burden, the district court also granted Junk's motion for summary judgment on that state-law cause of action.

## DISCUSSION

### Standard of Review

We review *de novo* the grant of summary judgment by a district court. *See Dodd v. Donahoe*, 715 F.3d 151, 155 (6th Cir. 2013). Summary judgment will be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A genuine dispute of material fact exists only when, assuming the truth of the nonmoving party's evidence and construing all inferences

from that evidence in the light most favorable to the nonmoving party, there is sufficient evidence for a trier of fact to find for that party. *See Ciminillo v. Streicher*, 434 F.3d 461, 464 (6th Cir. 2006). A nonmoving party cannot withstand summary judgment, however, by introduction of a "mere scintilla" of evidence in its favor. *Id.*

**Hostile-Work-Environment Claims**

Pursuant to the relevant provisions of Title VII:

It shall be an unlawful employment practice for an employer . . . to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's . . . sex, . . . or . . . to deprive any individual of employment opportunities or otherwise adversely affect his status as an employee, because of such individual's . . . sex . . . .

42 U.S.C. § 2000e-2(a)(1) and (2). The United States Supreme Court has interpreted these provisions to provide protection to employees from a workplace that "is permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993) (citations and internal quotation marks omitted). Thus, to establish a claim of a hostile work environment, a plaintiff must show that: (1) she is a member of a protected class; (2) she was subjected to unwanted sexual harassment; (3) the harassment was based on her sex; (4) the harassment was severe or pervasive enough to have created a hostile work environment; and (5) the employer failed to take reasonable care to prevent and correct any sexually harassing behavior. *See Williams v. Gen. Motors Corp.*, 187 F.3d 553, 560-61 (6th Cir. 1999).

Before this court, the parties do not dispute that Junk did, at times, harass Daniels and that male and female employees in Junk's office were treated differently. They disagree, however, both on whether any such harassment or disparate treatment was precipitated by anti-

female animus and on whether the harassment was severe or pervasive enough to alter the conditions of Daniels's employment in the office.

For purposes of this case, therefore, we first must determine whether any harassment or disparate treatment experienced by Daniels was based on her sex or on some less suspect ground. Before delving into that thicket, it is wise to reiterate that harassment "based on sex" need not be "sexual"—as that term is understood in general parlance. As we made clear in *Williams*, "the law recognizes that non-sexual conduct may be illegally sex-based where it evinces 'anti-female animus, and therefore could be found to have contributed significantly to the hostile environment.'" *Id.* at 565 (quoting *Lipsett v. Univ. of Puerto Rico*, 864 F.2d 881, 905 (1st Cir. 1988)). In other words, "the conduct underlying a sexual harassment claim need not be overtly sexual in nature. *Any* unequal treatment of an employee *that would not occur but for the employee's gender* may, if sufficiently severe or pervasive under the *Harris* standard, constitute a hostile environment in violation of Title VII." *Id.* (emphasis in original).

Although Daniels attempts to cast all challenged employment actions taken by Junk in sexual-harassment terms, it is clear from the record before us that other considerations influenced many of those decisions. For example, Daniels argues that male employees were not required to clock in and out of work when the women in the front office were, that the men were not required to maintain 8:30 to 4:30 hours when the female office staff was, and that men were allowed to wear jeans to work when the women were not. However, Junk explained that the different standards were based not on sex but, rather, on job functions and responsibilities. Junk admitted that Charlie Reader, Brian Reader, and Earl Swepston did not work uniform 8:30 to 4:30 days. Charlie Reader, however, was an investigator, was not expected to perform office functions during normal office hours, and, thus, was allowed to work from 7:00 until 3:00.

Swepston, and Brian Reader also worked from 7:00 until 3:00 but, Junk said, that was because their responsibilities involved bringing detainees into court and fulfilling other duties that were performed more efficiently prior to 8:30. Moreover, other male employees did adhere to the 8:30 to 4:30 work day, even though "[i]t didn't work out as good as the 7:00 to 3:00" schedule.

As alleged by Daniels, some of the men did not have to clock in and out of work and were allowed to wear jeans on the job. All employees, however, were allowed to wear jeans on Fridays, and some of the male employees were not expected to wear office-appropriate clothing even on other workdays because their jobs entailed physical components incompatible with office dress. For example, during his deposition testimony, Junk specifically referenced Savage and Swepston, both of whom were diversion officers who worked with inmate crews in ditches throughout the county. Even so, Junk still did not want those employees "coming in just like they got off a Harley-Davidson or ready to go wash the car."

However, other acts and comments by Junk could be construed as evidence of anti-female animus because the prosecutor did not harass, belittle, or oversee male employees in the same manner as he did Daniels and other female employees. Junk checked the search histories on only the women's computers; he stated in front of members of the public that he needed to check on only the women in the office to ensure that they were completing their work; he asked only the female employees if they had clocked in; he expressed gratitude to only the women in the office that they were working and not whining; "oftentimes, instead of addressing [the female employees] directly, he would speak to others about them as if they were not present"; he made unambiguous comments that he didn't like to hire women and that it was easier to work with men than women; and he once popped bubble wrap behind Daniels because he enjoyed tormenting and upsetting the women and "wanted to see [them] shake or jump."

In the aggregate, such behavior clearly raises at least the specter of anti-female animus. Such harassment is not actionable under Title VII and under the Ohio Civil Rights Act, however, unless Junk's conduct also can be considered severe or pervasive enough to create a hostile work environment. "[T]he test for a hostile work environment has both objective and subjective components." *Williams*, 187 F.3d at 566. As explained in *Harris*:

> Conduct that is not severe or pervasive enough to create an objectively hostile or abusive work environment—an environment that a reasonable person would find hostile or abusive—is beyond Title VII's purview. Likewise, if the victim does not subjectively perceive the environment to be abusive, the conduct has not actually altered the conditions of the victim's employment, and there is no Title VII violation.

510 U.S. at 21-22.

There can be little doubt that Daniels *subjectively* perceived the working environment in Junk's office to be hostile and abusive. She claimed that by the end of her employment in the office, her "nerves were shot", and that Junk did not seem to be happy "unless he was, he was upsetting [the women employees]."

When determining whether a working environment is *objectively* hostile or abusive, we have been directed by the Supreme Court to consider the totality of the circumstances, *id.* at 23, meaning that we cannot "disaggregrate" the alleged incidents of harassment, "divorcing them from their context and depriving them of their full force." *Williams*, 187 F.3d at 562. Instead, we must examine the "frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Harris*, 510 U.S. at 23; *see also Bowman v. Shawnee State Univ.*, 220 F.3d 456, 463 (6th Cir. 2000). But "Title VII does not prohibit 'genuine but innocuous differences in the ways men and women routinely interact with members of the same sex and of the opposite sex,'" and "'simple teasing,' offhand comments, and isolated

incidents (unless extremely serious) will not amount to discriminatory changes in the 'terms and conditions of employment.'" *Faragher*, 524 U.S. at 788 (quoting *Oncale*, 523 U.S. at 81-82).

Daniels and Barron pointed to numerous incidents that they asserted were objectively hostile or abusive. The district court succinctly catalogued those actions by Junk as follows:

> (1) he permitted male diversion officers (excluding Jason Savage) to work hours other than 8:30 a.m. to 4:30 p.m.; (2) he did not strictly require male diversion officers (excluding Jason Savage) to punch a time clock; (3) he accessed female employees' computers to check on their personal internet search histories and, on one occasion, he accessed and left female employees' search histories on their computer screens; (4) he prohibited plaintiff Barron from cashing in her vacation time, but permitted male employees to do so; (5) he laughed and chatted with male employees, but "smirked" at female employees; (6) on one occasion, he commented to plaintiff Daniels that she looked like she had lost her best friend; (7) he loudly popped packing materials in the area where the female employees worked; (8) he told members of the public on one or two occasions that "these girls have work they need to be doing. I'm just making sure they're doing what they're supposed to do."; (9) he stated in front of female employees, "Everybody working. Nobody's whining. That's the way we like it."; (10) he asked, in front of the female employees, whether "everyone" had punched the time clock; (11) he spoke to others about plaintiffs as if plaintiffs were not present; and (12) he asked plaintiff Daniels on one occasion why she was wearing jeans and said "if you say so" and stomped off when plaintiff Daniels reminded him that he had given her additional time to comply with the dress code.

Additionally, Daniels mentioned in her filings before both the district court and before us the incident in which Junk, while holding an AR-15, commented to Daniels that he was "not that mad" and then laughed.

There is little doubt that the working relationship between Junk and Daniels deteriorated significantly after October 2013. However, the listed instances of alleged harassment, even in the aggregate, would not be considered by a rational person to be sufficiently severe or pervasive so as to alter the conditions of the plaintiff's employment. One of the instances of alleged harassment—the prohibition on Barron taking cash rather than leave time for accrued vacation days—did not even concern Daniels. Numerous others involved implementation of office

policies that reflected the realities of the responsibilities of office personnel. Others were relatively innocent, singular occurrences, comments that were not objectively hostile or abusive, or "mere offensive utterance[s]." Even the incident involving Junk's comment while holding a firearm was not as severe as it might otherwise have been in a different scenario given the fact that the record established that guns were regularly carried (and presumably displayed) in the prosecutor's office. Without question, Junk's actions in that regard showed both immaturity and bad judgment. The totality of the circumstances, however, do not support the conclusion that the working environment was objectively hostile or abusive. The district court thus did not err in granting summary judgment to Junk on Daniels's hostile-work-environment claims.

**Termination Claims**

Daniels also asserts that Junk violated the provisions of Title VII and the Ohio Civil Rights Act by firing her from her job because she was a female. A plaintiff in such an employment-discrimination case may seek to establish her claim "either by introducing direct evidence of discrimination or by presenting circumstantial evidence that would support an inference of discrimination." *Laster v. City of Kalamazoo*, 746 F.3d 714, 726 (6th Cir. 2014) (citation omitted). Although evidence was adduced in this matter that Junk stated that he did not like to hire women and that he found it easier working with men, Daniels offered no direct evidence that she was fired due to her gender. Thus, for her to succeed on her claims of wrongful termination, she must seek to prove unlawful discrimination by circumstantial evidence utilizing the burden-shifting framework set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973), and refined in *Texas Department of Community Affairs v. Burdine*, 450 U.S. 248 (1981).

Under that paradigm, a plaintiff first must establish a *prima facie* case of discrimination. *Burdine*, 450 U.S. at 252-53 (citing *McDonnell Douglas*, 411 U.S. at 802). If the plaintiff can do so, the burden of production shifts to the defendant to "articulate some legitimate, nondiscriminatory reason for the [alleged adverse action.]" *Id.* (quoting *McDonnell Douglas*, 411 U.S. at 802). The plaintiff then is required to prove that the reasons proffered by the defendant were not the true motivations for the defendant's actions, but were mere pretexts for prohibited discrimination. *Id.* (citing *McDonnell Douglas*, 411 U.S. at 804).

We have held repeatedly that a plaintiff's burden of establishing a *prima facie* case is not an onerous one, *see, e.g.*, *Cline v. Catholic Diocese of Toledo*, 206 F.3d 651, 660 (6th Cir. 2000) (citing *Burdine*, 450 U.S. at 253), and is "a burden easily met." *Wrenn v. Gould*, 808 F.2d 493, 500 (6th Cir. 1987) (citations omitted). In a gender-discrimination case, a plaintiff thus initially needs to show only that: "(1) she is a member of a protected group; (2) she was subjected to an adverse employment decision; (3) she was qualified for the position; and (4) she was replaced by a person outside the protected class . . . ." *Peltier v. United States*, 388 F.3d 984, 987 (6th Cir. 2004). Daniels easily overcame that hurdle by introducing evidence that she was a woman who was qualified for the job she held but was fired from that position and replaced by Aaron Gullett, a male.

Junk then successfully articulated nondiscriminatory reasons for the termination decision. According to the prosecutor, Daniels had problems showing up for work on time, was hostile and short with him, and "always wanted to argue." He specified, however, that he fired the at-will employee both because of the statements she made about him to Tackett and Hannah and because of her poor job performance and attitude. Given the fact that Daniels then failed to offer

any evidence that those reasons actually were pretexts for invidious discrimination, the district court did not err in granting summary judgment to Junk on these causes of action as well.

**Retaliation Claims**

Title VII and the Ohio Civil Rights Act also make it unlawful for employers to retaliate against employees for engaging in "protected activity," such as opposing any practice made unlawful by the legislation, or lodging charges of discrimination. 42 U.S.C. § 2000e-3(a); Ohio Rev. Code § 4112.02(I). Daniels asserts, however, that Junk did just that by terminating her employment after she complained to Tara Tackett and Dominica Hannah about harassment and discrimination in the prosecutor's office.

As with claims of disparate treatment, a plaintiff may establish a claim of retaliation in violation of Title VII and the Ohio Civil Rights Act through either direct or circumstantial evidence. *Yazdian v. ConMed Endoscopic Techs., Inc.*, 793 F.3d 634, 644-45 (6th Cir. 2015). "Direct evidence is that evidence which, if believed, requires no inferences to conclude that unlawful retaliation was a motivating factor in the employer's action." *Imwalle v. Reliance Med. Prods., Inc.*, 515 F.3d 531, 543-44 (6th Cir. 2008). "If there is direct evidence of retaliation, then the plaintiff's case-in-chief is met, and the burden shifts to the employer to prove by a preponderance of the evidence that it would have made the same decision absent the impermissible motive." *Yazdian*, 793 F.3d at 648 (citation and internal quotation marks omitted).

In this case, Junk readily admits that "[o]ne of the reasons" he fired Daniels was the fact that she proved to be "disloyal" by making statements about him and about the office atmosphere to Tackett and Hannah. Although Junk then attempted to temper that assertion by claiming that Daniels's job performance, her attitude, and her continual arguing also contributed to the

decision to terminate her employment, he conceded that he had no immediate plans to fire her before she made the statements. Under such circumstances, we conclude that Daniels succeeded in offering direct evidence of retaliation *to the extent that* her conversation with the other county employees in the courthouse could be considered "protected activity."

The district court properly held that the fact that Daniels confided in a deputy sheriff and in a victim's advocate of a county organization combatting domestic violence—rather than in the sheriff himself or in the county commissioners—did not mean that she failed to report her complaint to an appropriate individual. As the district court noted, we have stated clearly "that there is no qualification . . . on the party to whom the complaint is made known . . . ." *Johnson v. Univ. of Cincinnati*, 215 F.3d 561, 580 (6th Cir. 2000). Indeed, a complaint of a possible Title VII violation "may be made to a co-worker, newspaper reporter, *or anyone else*." *Id.* (emphasis added).

Although the complaint need not "be lodged with absolute formality, clarity, or precision," *Yazdian*, 793 F.3d at 645 (citation omitted), it cannot be merely a "vague charge of discrimination." *Booker v. Brown & Williamson Tobacco Co.*, 879 F.2d 1304, 1313 (6th Cir. 1989). In granting summary judgment to Junk on Daniels's retaliation claims, the district court concluded that the plaintiff's statements to Tackett and Hannah were just such vague charges. The district court did note that Daniels testified in her deposition that she told Tackett and Hannah "about the behavior in the office . . . [the] environment" and that she "just went on about all the changes and the treatment in the office . . . and disclosed *everything* to Nika and Tara." (Emphasis added.) Nevertheless, the district court held that such allegations failed to state specifically that Daniels "was being sexually harassed or discriminated against on account of her sex or gender." Furthermore, the district court refused to consider as an explanation of those

conversations Daniels's subsequent statement in an affidavit that she told Tackett and Hannah that she "was being sexually harassed and treated differently in the office." According to the district court, the statement in the affidavit contradicted Daniels's earlier deposition testimony without providing an explanation for the disparity.

The district court's view of Daniels's deposition testimony appears to be too narrow, especially at the summary-judgment stage of the litigation when all inferences are to be viewed in the light most favorable to the nonmoving party. Daniels's statement in her deposition that she discussed "all the changes and the treatment in the office" with Tackett and Hannah and that she disclosed "everything" to them encompasses more than her mere disagreement with "office policies and managerial style." Indeed, Daniels's deposition was replete with allegations of differing treatment of male and female employees, of efforts to harass and belittle Daniels and Barron, and of an intimidating atmosphere that the women were forced to endure on a daily basis. When Daniels referred to "the treatment in the office," there is little doubt that she was referencing the alleged harassment and disparate treatment that she had described and that she later referenced in her affidavit before the court. Thus, we find no inconsistency or contradiction between Daniels's deposition testimony and the specific allegations in her affidavit. Because Daniels's complaints to Tackett and Hannah, when viewed in their full context, were not vague or contradictory, the plaintiff did indeed engage in protected activity when discussing the culture and atmosphere of the office. Combined with Junk's admission that he terminated Daniels's employment because she made those statements, we conclude that Daniels has raised at least a genuine dispute of material fact that precludes summary judgment for the defendant on her retaliation claims.

**Claim of Intentional Infliction of Emotional Distress**

In a final allegation of error, Daniels contends that the district court improperly granted Junk summary judgment on her state-law tort claim of intentional infliction of emotional distress. Under Ohio law, plaintiffs seeking to succeed on a claim of intentional infliction of emotional distress bear a heavy burden and must establish:

> 1) that the actor either intended to cause emotional distress or knew or should have known that actions taken would result in serious emotional distress to the plaintiff; 2) that the actor's conduct was so extreme and outrageous as to go beyond all bounds of decency and was such that it can be considered as utterly intolerable in a civilized community; 3) that the actor's actions were the proximate cause of plaintiff's psychic injury; and 4) that the mental anguish suffered by plaintiff is serious and of a nature that no reasonable man could be expected to endure it.

*Hayward v. Cleveland Clinic Found.*, 759 F.3d 601, 619 (6th Cir. 2014) (quoting *Pyle v. Pyle*, 463 N.E.2d 98, 103 (Ohio Ct. App. 1983) (citations and internal quotation marks omitted)).

Daniels's state-law cause of action fails on many fronts. First, the plaintiff failed to offer any evidence, other than her own conjecture, that Junk intended to cause Daniels emotional distress or should have known his actions would cause such a severe reaction. Furthermore, although many of Junk's antics were boorish, juvenile, and perhaps even mean-spirited, we cannot say they were so intolerable as to go beyond all bounds of decency. Finally, "the mental anguish" suffered by Daniels was not so serious "that no reasonable [person] could be expected to endure it." In fact, after Daniels was fired in January 2014, she waited until August 2014 to see a physician about her emotional state and, at that time, was prescribed only a common anti-anxiety drug and did not require hospitalization or intensive therapy.

In short, Daniels has not adduced evidence sufficient to create a genuine dispute of fact regarding her claim of intentional infliction of emotional distress. The district court thus did not err in granting Junk summary judgment on that cause of action.

**CONCLUSION**

Plaintiff Daniels has failed to adduce sufficient evidence to support her allegations that she was fired by Junk because of her gender, that harassment in the office was so severe or pervasive as to create a hostile work environment, or that Junk intentionally inflicted the degree of emotional distress that would allow her claims in those regards to proceed to trial. However, Daniels did offer sufficient evidence to allow further consideration of her federal-law and state-law retaliation claims. We thus AFFIRM the district court's grant of summary judgment to the defendant on Daniels's hostile-work-environment, termination, and state-tort claims. We REVERSE the grant of summary judgment on the plaintiff's retaliation claims and REMAND the matter to the district court for such further proceedings as are appropriate.

**KAREN NELSON MOORE, Circuit Judge, concurring in part and dissenting in part.** I concur with the majority that summary judgment is inappropriate with respect to Daniels's retaliation claim. However, I respectfully dissent from the majority's conclusion that summary judgment is appropriate with respect to Daniels's claims of a hostile work environment, termination on the basis of gender, and intentional infliction of emotional distress.

With respect to Daniels's hostile-work-environment claim, I believe that Daniels has pointed to sufficiently severe and pervasive examples of sexual harassment "to alter the conditions of [Daniels's] employment and create an abusive working environment." *Phillips v. UAW Int'l*, 854 F.3d 323, 327 (6th Cir. 2017) (quoting *Williams v. CSX Transp. Co.*, 643 F.3d 502, 512 (6th Cir. 2011)). "In determining whether an actionable hostile work environment claim exists, we look to all the circumstances, including the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Id.* (quoting *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 116 (2002)). Frequent examples of Pike County Prosecutor Robert Junk treating women differently than men, often in humiliating fashion, R. 36 (Op. & Order at 23–24) (Page ID #545–46) (listing twelve instances of harassing or discriminatory conduct toward women in the office), alongside Junk's discriminatory statements about women in the workplace, R. 31-3 (Gullett Aff. ¶ 20) (Page ID #407), would permit a reasonable juror to conclude that there was a hostile work environment. In one particularly egregious example, reasonable jurors could even find that Junk's conduct was "physically threatening." *Phillips*, 854 F.3d at 327. At a point when Junk and Daniels "were not on good terms," Junk—while holding an AR-15—told Daniels, "Don't worry. I'm not that mad, ha, ha, ha, ha." R. 26-2 (Daniels Dep. at 30–31) (Page ID #235–36). Other courts have held

similar behavior to constitute a hostile work environment, and I would do the same here. *See Cordero-Suárez v. Rodríguez*, 689 F.3d 77, 79, 82–83 (1st Cir. 2012) (holding that a supervisor who approached an employee's desk with a work-issued gun and said "I'm going to screw you up" contributed to a hostile work environment).

I would also reverse the district court's judgment with respect to Daniels's termination claim, particularly because of the genuine issues surrounding pretext. The strongest evidence of discriminatory pretext are Junk's "disparaging comments toward females, including, 'That's why I don't like to hire women,' 'That's why it is a pain to hire women,' and 'Working with men is so much easier than working with women.'" R. 31-3 (Gullett Aff. ¶ 20) (Page ID #407). These statements are almost direct evidence that Junk made employment decisions on the basis of gender. At the very least, I believe that they create a genuine issue of material fact on whether Daniels was actually terminated because of her sex.

Finally, I believe that summary judgment is inappropriate on Daniels's claim of intentional infliction of emotional distress ("IIED"). An IIED claim has four elements under Ohio law: "1) that the actor either intended to cause emotional distress or knew or should have known that actions taken would result in serious emotional distress to the plaintiff; 2) that the actor's conduct was so extreme and outrageous as to go beyond all possible bounds of decency and was such that it can be considered as utterly intolerable in a civilized community; 3) that the actor's actions were the proximate cause of plaintiff's psychic injury; and 4) that the mental anguish suffered by plaintiff is serious and of a nature that no reasonable man could be expected to endure it." *Hayward v. Cleveland Clinic Found.*, 759 F.3d 601, 619 (6th Cir. 2014) (quoting *Pyle v. Pyle*, 463 N.E.2d 98, 103 (Ohio Ct. App. 1983)). There is sufficient evidence of Junk's intent to cause emotional distress to permit a reasonable juror to find in Daniels's favor on the

first element:  Junk stated that he did not like working with women.  R. 31-3 (Gullett Aff. ¶ 20) (Page ID #407).  And Junk appeared to know what he was doing when he harassed Daniels.  R. 26-2 (Daniels Dep. at 60–62) (Page ID #265–67).  A reasonable juror could also find in Daniels's favor on the second, third, and fourth elements:  Junk repeatedly demeaned Daniels, threatened her with a gun, discriminated against her, and pranked her.  Daniels visited a doctor because of "the whole stress of this whole thing" and was prescribed a drug that treats anxiety.  *Id.* at 57–58 (Page ID #262–63).

In sum, I believe that genuine issues of material fact are present in all of Daniels's claims.  Therefore I would reverse the judgment of the district court in its entirety.